Justice KENNEDY delivered the opinion of the Court.
This is another case in a series of decisions involving the sentencing of offenders who were juveniles when their crimes were committed. In Miller v. Alabama, 567 U.S. ----, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), the Court held that a juvenile convicted of a homicide offense could not be sentenced to life in prison without parole absent consideration of the juvenile's special circumstances in light of the principles and purposes of juvenile sentencing. In the wake of Miller , the question has arisen whether its holding is retroactive to juvenile offenders whose convictions and sentences were final when Miller was decided. Courts have reached different conclusions on this point. Compare, e.g., Martin v. Symmes, 782 F.3d 939, 943 (C.A.8 2015) ; Johnson v. Ponton, 780 F.3d 219, 224-226 (C.A.4 2015) ; Chambers v. State, 831 N.W.2d 311, 331 (Minn.2013) ; and State v. Tate, 2012-2763, p. 17 (La.11/5/13), 130 So.3d 829, 841, with Diatchenko v. District Attorney for Suffolk Dist., 466 Mass. 655, 661-667, 1 N.E.3d 270, 278-282 (2013) ; Aiken v. Byars, 410 S.C. 534, 548, 765 S.E.2d 572, 578 (2014) ; State v. Mares, 2014 WY 126, ¶¶ 47-63, 335 P.3d 487, 504-508 ; and People v. Davis, 2014 IL 115595, ¶ 41, 379 Ill.Dec. 381, 6 N.E.3d 709, 722. Certiorari was granted in this case to resolve the question.
I
Petitioner is Henry Montgomery. In 1963, Montgomery killed Charles Hurt, a deputy sheriff in East Baton Rouge, Louisiana. Montgomery was 17 years old at the time of the crime. He was convicted of murder and sentenced to death, but the Louisiana Supreme Court reversed his conviction after finding that public prejudice had prevented a fair trial. State v. Montgomery, 248 La. 713, 181 So.2d 756, 762 (1966).
Montgomery was retried. The jury returned a verdict of "guilty without capital punishment."
*726 State v. Montgomery, 257 La. 461, 242 So.2d 818 (1970). Under Louisiana law, this verdict required the trial court to impose a sentence of life without parole. The sentence was automatic upon the jury's verdict, so Montgomery had no opportunity to present mitigation evidence to justify a less severe sentence. That evidence might have included Montgomery's young age at the time of the crime; expert testimony regarding his limited capacity for foresight, self-discipline, and judgment; and his potential for rehabilitation. Montgomery, now 69 years old, has spent almost his entire life in prison.
Almost 50 years after Montgomery was first taken into custody, this Court decided Miller v. Alabama, 567 U.S. ----, 132 S.Ct. 2455, 183 L.Ed.2d 407. Miller held that mandatory life without parole for juvenile homicide offenders violates the Eighth Amendment's prohibition on " 'cruel and unusual punishments.' " Id ., at ----, 132 S.Ct., at 2460. "By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence," mandatory life without parole "poses too great a risk of disproportionate punishment." Id., at ----, 132 S.Ct., at 2469. Miller required that sentencing courts consider a child's "diminished culpability and heightened capacity for change" before condemning him or her to die in prison. Ibid. Although Miller did not foreclose a sentencer's ability to impose life without parole on a juvenile, the Court explained that a lifetime in prison is a disproportionate sentence for all but the rarest of children, those whose crimes reflect " 'irreparable corruption.' " Ibid. (quoting Roper v. Simmons, 543 U.S. 551, 573, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) ).
After this Court issued its decision in Miller , Montgomery sought collateral review of his mandatory life-without-parole sentence. In Louisiana there are two principal mechanisms for collateral challenge to the lawfulness of imprisonment. Each begins with a filing in the trial court where the prisoner was convicted and sentenced. La.Code Crim. Proc. Ann., Arts. 882, 926 (West 2008). The first procedure permits a prisoner to file an application for postconviction relief on one or more of seven grounds set forth in the statute. Art. 930.3. The Louisiana Supreme Court has held that none of those grounds provides a basis for collateral review of sentencing errors. See State ex rel. Melinie v. State, 93-1380 (La.1/12/96), 665 So.2d 1172 (per curiam ). Sentencing errors must instead be raised through Louisiana's second collateral review procedure.
This second mechanism allows a prisoner to bring a collateral attack on his or her sentence by filing a motion to correct an illegal sentence. See Art. 882. Montgomery invoked this procedure in the East Baton Rouge Parish District Court.
The state statute provides that "[a]n illegal sentence may be corrected at any time by the court that imposed the sentence." Ibid . An illegal sentence "is primarily restricted to those instances in which the term of the prisoner's sentence is not authorized by the statute or statutes which govern the penalty" for the crime of conviction. State v. Mead, 2014-1051, p. 3 (La.App. 4 Cir. 4/22/15), 165 So.3d 1044, 1047 ; see also State v. Alexander, 2014-0401 (La.11/7/14), 152 So.3d 137 (per curiam ). In the ordinary course Louisiana courts will not consider a challenge to a disproportionate sentence on collateral review; rather, as a general matter, it appears that prisoners must raise Eighth Amendment sentencing challenges on direct review. See State v. Gibbs, 620 So.2d 296, 296-297 (La.App.1993) ; Mead, 165 So.3d, at 1047.
Louisiana's collateral review courts will, however, consider a motion to correct *727 an illegal sentence based on a decision of this Court holding that the Eighth Amendment to the Federal Constitution prohibits a punishment for a type of crime or a class of offenders. When, for example, this Court held in Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), that the Eighth Amendment bars life-without-parole sentences for juvenile nonhomicide offenders, Louisiana courts heard Graham claims brought by prisoners whose sentences had long been final. See, e.g., State v. Shaffer, 2011-1756, pp. 1-4 (La.11/23/11), 77 So.3d 939, 940-942 (per curiam ) (considering motion to correct an illegal sentence on the ground that Graham rendered illegal a life-without-parole sentence for a juvenile nonhomicide offender). Montgomery's motion argued that Miller rendered his mandatory life-without-parole sentence illegal.
The trial court denied Montgomery's motion on the ground that Miller is not retroactive on collateral review. Montgomery then filed an application for a supervisory writ. The Louisiana Supreme Court denied the application. 2013-1163 (6/20/14), 141 So.3d 264. The court relied on its earlier decision in State v. Tate, 2012-2763, 130 So.3d 829, which held that Miller does not have retroactive effect in cases on state collateral review. Chief Justice Johnson and Justice Hughes dissented in Tate , and Chief Justice Johnson again noted her dissent in Montgomery's case.
This Court granted Montgomery's petition for certiorari. The petition presented the question "whether Miller adopts a new substantive rule that applies retroactively on collateral review to people condemned as juveniles to die in prison." Pet. for Cert. i. In addition, the Court directed the parties to address the following question: "Do we have jurisdiction to decide whether the Supreme Court of Louisiana correctly refused to give retroactive effect in this case to our decision in Miller ?" 575 U.S. ----, 135 S.Ct. 1546, 191 L.Ed.2d 635 (2015).
II
The parties agree that the Court has jurisdiction to decide this case. To ensure this conclusion is correct, the Court appointed Richard D. Bernstein as amicus curiae to brief and argue the position that the Court lacks jurisdiction. He has ably discharged his assigned responsibilities.
Amicus argues that a State is under no obligation to give a new rule of constitutional law retroactive effect in its own collateral review proceedings. As those proceedings are created by state law and under the State's plenary control, amicus contends, it is for state courts to define applicable principles of retroactivity. Under this view, the Louisiana Supreme Court's decision does not implicate a federal right; it only determines the scope of relief available in a particular type of state proceeding-a question of state law beyond this Court's power to review.
If, however, the Constitution establishes a rule and requires that the rule have retroactive application, then a state court's refusal to give the rule retroactive effect is reviewable by this Court. Cf. Griffith v. Kentucky, 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) (holding that on direct review, a new constitutional rule must be applied retroactively "to all cases, state or federal"). States may not disregard a controlling, constitutional command in their own courts. See Martin v. Hunter's Lessee, 1 Wheat. 304, 340-341, 344, 4 L.Ed. 97 (1816) ; see also Yates v. Aiken, 484 U.S. 211, 218, 108 S.Ct. 534, 98 L.Ed.2d 546 (1988) (when a State has not "placed any limit on the issues that it will entertain in collateral proceedings ... it has a duty to grant the relief that federal *728 law requires"). Amicus ' argument therefore hinges on the premise that this Court's retroactivity precedents are not a constitutional mandate.
Justice O'Connor's plurality opinion in Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), set forth a framework for retroactivity in cases on federal collateral review. Under Teague, a new constitutional rule of criminal procedure does not apply, as a general matter, to convictions that were final when the new rule was announced. Teague recognized, however, two categories of rules that are not subject to its general retroactivity bar. First, courts must give retroactive effect to new substantive rules of constitutional law. Substantive rules include "rules forbidding criminal punishment of certain primary conduct," as well as "rules prohibiting a certain category of punishment for a class of defendants because of their status or offense." Penry v. Lynaugh, 492 U.S. 302, 330, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) ; see also Teague, supra, at 307, 109 S.Ct. 1060. Although Teague describes new substantive rules as an exception to the bar on retroactive application of procedural rules, this Court has recognized that substantive rules "are more accurately characterized as ... not subject to the bar." Schriro v. Summerlin, 542 U.S. 348, 352, n. 4, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004). Second, courts must give retroactive effect to new " ' "watershed rules of criminal procedure" implicating the fundamental fairness and accuracy of the criminal proceeding.' " Id ., at 352, 124 S.Ct. 2519 ; see also Teague, 489 U.S., at 312-313, 109 S.Ct. 1060.
It is undisputed, then, that Teague requires the retroactive application of new substantive and watershed procedural rules in federal habeas proceedings. Amicus, however, contends that Teague was an interpretation of the federal habeas statute, not a constitutional command; and so, the argument proceeds, Teague 's retroactivity holding simply has no application in a State's own collateral review proceedings.
To support this claim, amicus points to language in Teague that characterized the Court's task as " 'defin[ing] the scope of the writ.' " Id ., at 308, 109 S.Ct. 1060 (quoting Kuhlmann v. Wilson, 477 U.S. 436, 447, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986) (plurality opinion)); see also 489 U.S., at 317, 109 S.Ct. 1060 (White, J., concurring in part and concurring in judgment) ("If we are wrong in construing the reach of the habeas corpus statutes, Congress can of course correct us ..."); id., at 332, 109 S.Ct. 1060 (Brennan, J., dissenting) ("No new facts or arguments have come to light suggesting that our [past] reading of the federal habeas statute ... was plainly mistaken").
In addition, amicus directs us to Danforth v. Minnesota, 552 U.S. 264, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008), in which a majority of the Court held that Teague does not preclude state courts from giving retroactive effect to a broader set of new constitutional rules than Teague itself required. 552 U.S., at 266, 128 S.Ct. 1029. The Danforth majority concluded that Teague 's general rule of nonretroactivity for new constitutional rules of criminal procedure "was an exercise of this Court's power to interpret the federal habeas statute." 552 U.S., at 278, 128 S.Ct. 1029. Since Teague 's retroactivity bar "limit[s] only the scope of federal habeas relief," the Danforth majority reasoned, States are free to make new procedural rules retroactive on state collateral review. 552 U.S., at 281-282, 128 S.Ct. 1029.
Amicus, however, reads too much into these statements. Neither Teague nor Danforth had reason to address whether *729 States are required as a constitutional matter to give retroactive effect to new substantive or watershed procedural rules. Teague originated in a federal, not state, habeas proceeding; so it had no particular reason to discuss whether any part of its holding was required by the Constitution in addition to the federal habeas statute. And Danforth held only that Teague 's general rule of nonretroactivity was an interpretation of the federal habeas statute and does not prevent States from providing greater relief in their own collateral review courts. The Danforth majority limited its analysis to Teague 's general retroactivity bar, leaving open the question whether Teague 's two exceptions are binding on the States as a matter of constitutional law. 552 U.S., at 278, 128 S.Ct. 1029 ; see also id., at 277, 128 S.Ct. 1029 ("[T]he case before us now does not involve either of the 'Teague exceptions' ").
In this case, the Court must address part of the question left open in Danforth . The Court now holds that when a new substantive rule of constitutional law controls the outcome of a case, the Constitution requires state collateral review courts to give retroactive effect to that rule. Teague 's conclusion establishing the retroactivity of new substantive rules is best understood as resting upon constitutional premises. That constitutional command is, like all federal law, binding on state courts. This holding is limited to Teague 's first exception for substantive rules; the constitutional status of Teague 's exception for watershed rules of procedure need not be addressed here.
This Court's precedents addressing the nature of substantive rules, their differences from procedural rules, and their history of retroactive application establish that the Constitution requires substantive rules to have retroactive effect regardless of when a conviction became final.
The category of substantive rules discussed in Teague originated in Justice Harlan's approach to retroactivity. Teague adopted that reasoning. See 489 U.S., at 292, 312, 109 S.Ct. 1060 (discussing Mackey v. United States, 401 U.S. 667, 692, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971) (opinion concurring in judgments in part and dissenting in part); and Desist v. United States, 394 U.S. 244, 261, n. 2, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969) (Harlan, J., dissenting)). Justice Harlan defined substantive constitutional rules as "those that place, as a matter of constitutional interpretation, certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." Mackey, supra, at 692, 91 S.Ct. 1160. In Penry v. Lynaugh, decided four months after Teague, the Court recognized that "the first exception set forth in Teague should be understood to cover not only rules forbidding criminal punishment of certain primary conduct but also rules prohibiting a certain category of punishment for a class of defendants because of their status or offense." 492 U.S., at 330, 109 S.Ct. 2934. Penry explained that Justice Harlan's first exception spoke "in terms of substantive categorical guarantees accorded by the Constitution, regardless of the procedures followed." Id., at 329, 109 S.Ct. 2934. Whether a new rule bars States from proscribing certain conduct or from inflicting a certain punishment, "[i]n both cases, the Constitution itself deprives the State of the power to impose a certain penalty." Id., at 330, 109 S.Ct. 2934.
Substantive rules, then, set forth categorical constitutional guarantees that place certain criminal laws and punishments altogether beyond the State's power to impose. It follows that when a State enforces a proscription or penalty barred by the Constitution, the resulting *730 conviction or sentence is, by definition, unlawful. Procedural rules, in contrast, are designed to enhance the accuracy of a conviction or sentence by regulating "the manner of determining the defendant's culpability." Schriro, 542 U.S., at 353, 124 S.Ct. 2519 ; Teague, supra, at 313, 109 S.Ct. 1060. Those rules "merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise." Schriro, supra, at 352, 124 S.Ct. 2519. Even where procedural error has infected a trial, the resulting conviction or sentence may still be accurate; and, by extension, the defendant's continued confinement may still be lawful. For this reason, a trial conducted under a procedure found to be unconstitutional in a later case does not, as a general matter, have the automatic consequence of invalidating a defendant's conviction or sentence.
The same possibility of a valid result does not exist where a substantive rule has eliminated a State's power to proscribe the defendant's conduct or impose a given punishment. "[E]ven the use of impeccable factfinding procedures could not legitimate a verdict" where "the conduct being penalized is constitutionally immune from punishment." United States v. United States Coin & Currency, 401 U.S. 715, 724, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971). Nor could the use of flawless sentencing procedures legitimate a punishment where the Constitution immunizes the defendant from the sentence imposed. "No circumstances call more for the invocation of a rule of complete retroactivity." Ibid.
By holding that new substantive rules are, indeed, retroactive, Teague continued a long tradition of giving retroactive effect to constitutional rights that go beyond procedural guarantees. See Mackey, supra, at 692-693, 91 S.Ct. 1160 (opinion of Harlan, J.) ("[T]he writ has historically been available for attacking convictions on [substantive] grounds"). Before Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953), "federal courts would never consider the merits of a constitutional claim if the habeas petitioner had a fair opportunity to raise his arguments in the original proceeding." Desist, 394 U.S., at 261, 89 S.Ct. 1030 (Harlan, J., dissenting). Even in the pre-1953 era of restricted federal habeas, however, an exception was made "when the habeas petitioner attacked the constitutionality of the state statute under which he had been convicted. Since, in this situation, the State had no power to proscribe the conduct for which the petitioner was imprisoned, it could not constitutionally insist that he remain in jail." Id., at 261, n. 2, 89 S.Ct. 1030 (Harlan, J., dissenting) (citation omitted).
In Ex parte Siebold, 100 U.S. 371, 25 L.Ed. 717 (1880), the Court addressed why substantive rules must have retroactive effect regardless of when the defendant's conviction became final. At the time of that decision, "[m]ere error in the judgment or proceedings, under and by virtue of which a party is imprisoned, constitute[d] no ground for the issue of the writ." Id ., at 375. Before Siebold, the law might have been thought to establish that so long as the conviction and sentence were imposed by a court of competent jurisdiction, no habeas relief could issue. In Siebold, however, the petitioners attacked the judgments on the ground that they had been convicted under unconstitutional statutes. The Court explained that if "this position is well taken, it affects the foundation of the whole proceedings." Id., at 376. A conviction under an unconstitutional law
"is not merely erroneous, but is illegal and void, and cannot be a legal cause of imprisonment. It is true, if no writ of error lies, the judgment may be final, in *731 the sense that there may be no means of reversing it. But ... if the laws are unconstitutional and void, the Circuit Court acquired no jurisdiction of the causes." Id., at 376-377.
As discussed, the Court has concluded that the same logic governs a challenge to a punishment that the Constitution deprives States of authority to impose. Penry, supra, at 330, 109 S.Ct. 2934 ; see also Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 151 (1970) ("Broadly speaking, the original sphere for collateral attack on a conviction was where the tribunal lacked jurisdiction either in the usual sense or because the statute under which the defendant had been prosecuted was unconstitutional or because the sentence was one the court could not lawfully impose" (footnotes omitted)). A conviction or sentence imposed in violation of a substantive rule is not just erroneous but contrary to law and, as a result, void. See Siebold, 100 U.S., at 376. It follows, as a general principle, that a court has no authority to leave in place a conviction or sentence that violates a substantive rule, regardless of whether the conviction or sentence became final before the rule was announced.
Siebold and the other cases discussed in this opinion, of course, do not directly control the question the Court now answers for the first time. These precedents did not involve a state court's postconviction review of a conviction or sentence and so did not address whether the Constitution requires new substantive rules to have retroactive effect in cases on state collateral review. These decisions, however, have important bearing on the analysis necessary in this case.
In support of its holding that a conviction obtained under an unconstitutional law warrants habeas relief, the Siebold Court explained that "[a]n unconstitutional law is void, and is as no law." Ibid. A penalty imposed pursuant to an unconstitutional law is no less void because the prisoner's sentence became final before the law was held unconstitutional. There is no grandfather clause that permits States to enforce punishments the Constitution forbids. To conclude otherwise would undercut the Constitution's substantive guarantees. Writing for the Court in United States Coin & Currency, Justice Harlan made this point when he declared that "[n]o circumstances call more for the invocation of a rule of complete retroactivity" than when "the conduct being penalized is constitutionally immune from punishment." 401 U.S., at 724, 91 S.Ct. 1041. United States Coin & Currency involved a case on direct review; yet, for the reasons explained in this opinion, the same principle should govern the application of substantive rules on collateral review. As Justice Harlan explained, where a State lacked the power to proscribe the habeas petitioner's conduct, "it could not constitutionally insist that he remain in jail." Desist, supra, at 261, n. 2, 89 S.Ct. 1030 (dissenting opinion).
If a State may not constitutionally insist that a prisoner remain in jail on federal habeas review, it may not constitutionally insist on the same result in its own postconviction proceedings. Under the Supremacy Clause of the Constitution, state collateral review courts have no greater power than federal habeas courts to mandate that a prisoner continue to suffer punishment barred by the Constitution. If a state collateral proceeding is open to a claim controlled by federal law, the state court "has a duty to grant the relief that federal law requires." Yates, 484 U.S., at 218, 108 S.Ct. 534. Where state collateral review proceedings permit prisoners to challenge the lawfulness of their confinement, States cannot refuse to *732 give retroactive effect to a substantive constitutional right that determines the outcome of that challenge.
As a final point, it must be noted that the retroactive application of substantive rules does not implicate a State's weighty interests in ensuring the finality of convictions and sentences. Teague warned against the intrusiveness of "continually forc[ing] the States to marshal resources in order to keep in prison defendants whose trials and appeals conformed to then-existing constitutional standards." 489 U.S., at 310, 109 S.Ct. 1060. This concern has no application in the realm of substantive rules, for no resources marshaled by a State could preserve a conviction or sentence that the Constitution deprives the State of power to impose. See Mackey, 401 U.S., at 693, 91 S.Ct. 1160 (opinion of Harlan, J.) ("There is little societal interest in permitting the criminal process to rest at a point where it ought properly never to repose").
In adjudicating claims under its collateral review procedures a State may not deny a controlling right asserted under the Constitution, assuming the claim is properly presented in the case. Louisiana follows these basic Supremacy Clause principles in its postconviction proceedings for challenging the legality of a sentence. The State's collateral review procedures are open to claims that a decision of this Court has rendered certain sentences illegal, as a substantive matter, under the Eighth Amendment. See, e.g., State v. Dyer, 2011-1758, pp. 1-2 (La.11/23/11), 77 So.3d 928, 928-929 (per curiam ) (considering claim on collateral review that this Court's decision in Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825, rendered petitioner's life-without-parole sentence illegal). Montgomery alleges that Miller announced a substantive constitutional rule and that the Louisiana Supreme Court erred by failing to recognize its retroactive effect. This Court has jurisdiction to review that determination.
III
This leads to the question whether Miller 's prohibition on mandatory life without parole for juvenile offenders indeed did announce a new substantive rule that, under the Constitution, must be retroactive.
As stated above, a procedural rule "regulate[s] only the manner of determining the defendant's culpability." Schriro, 542 U.S., at 353, 124 S.Ct. 2519. A substantive rule, in contrast, forbids "criminal punishment of certain primary conduct" or prohibits "a certain category of punishment for a class of defendants because of their status or offense." Penry, 492 U.S., at 330, 109 S.Ct. 2934 ; see also Schriro, supra, at 353, 124 S.Ct. 2519 (A substantive rule "alters the range of conduct or the class of persons that the law punishes"). Under this standard, and for the reasons explained below, Miller announced a substantive rule that is retroactive in cases on collateral review.
The "foundation stone" for Miller 's analysis was this Court's line of precedent holding certain punishments disproportionate when applied to juveniles. 567 U.S., at ----, n. 4, 132 S.Ct., at 2464, n. 4. Those cases include Graham v. Florida, supra, which held that the Eighth Amendment bars life without parole for juvenile nonhomicide offenders, and Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1, which held that the Eighth Amendment prohibits capital punishment for those under the age of 18 at the time of their crimes. Protection against disproportionate punishment is the central substantive guarantee of the Eighth Amendment and goes far beyond the manner of *733 determining a defendant's sentence. See Graham, supra, at 59, 130 S.Ct. 2011 ("The concept of proportionality is central to the Eighth Amendment"); see also Weems v. United States, 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910) ; Harmelin v. Michigan, 501 U.S. 957, 997-998, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (KENNEDY, J., concurring in part and concurring in judgment).
Miller took as its starting premise the principle established in Roper and Graham that "children are constitutionally different from adults for purposes of sentencing." 567 U.S., at ----, 132 S.Ct., at 2464 (citing Roper, supra, at 569-570, 125 S.Ct. 1183 ; and Graham, supra, at 68, 130 S.Ct. 2011 ). These differences result from children's "diminished culpability and greater prospects for reform," and are apparent in three primary ways:
"First, children have a 'lack of maturity and an underdeveloped sense of responsibility,' leading to recklessness, impulsivity, and heedless risk-taking. Second, children 'are more vulnerable to negative influences and outside pressures,' including from their family and peers; they have limited 'control over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievable depravity.' " 567 U.S., at ----, 132 S.Ct., at 2464 (quoting Roper, supra, at 569-570, 125 S.Ct. 1183 ; alterations, citations, and some internal quotation marks omitted).
As a corollary to a child's lesser culpability, Miller recognized that "the distinctive attributes of youth diminish the penological justifications" for imposing life without parole on juvenile offenders. 567 U.S., at ----, 132 S.Ct., at 2465. Because retribution "relates to an offender's blameworthiness, the case for retribution is not as strong with a minor as with an adult." Ibid. (quoting Graham, supra, at 71, 130 S.Ct. 2011 ; internal quotation marks omitted). The deterrence rationale likewise does not suffice, since "the same characteristics that render juveniles less culpable than adults-their immaturity, recklessness, and impetuosity-make them less likely to consider potential punishment." 567 U.S., at ---- - ----, 132 S.Ct., at 2465 (internal quotation marks omitted). The need for incapacitation is lessened, too, because ordinary adolescent development diminishes the likelihood that a juvenile offender " 'forever will be a danger to society.' " Id., at ----, 132 S.Ct., at 2465 (quoting Graham, 560 U.S., at 72, 130 S.Ct. 2011 ). Rehabilitation is not a satisfactory rationale, either. Rehabilitation cannot justify the sentence, as life without parole "forswears altogether the rehabilitative ideal." 567 U.S., at ----, 132 S.Ct., at 2465 (quoting Graham, supra, at 74, 130 S.Ct. 2011 ).
These considerations underlay the Court's holding in Miller that mandatory life-without-parole sentences for children "pos[e] too great a risk of disproportionate punishment." 567 U.S., at ----, 132 S.Ct., at 2469. Miller requires that before sentencing a juvenile to life without parole, the sentencing judge take into account "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." Ibid. The Court recognized that a sentencer might encounter the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified. But in light of "children's diminished culpability and heightened capacity for change," Miller made clear that "appropriate occasions *734 for sentencing juveniles to this harshest possible penalty will be uncommon." Ibid.
Miller , then, did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of "the distinctive attributes of youth." Id., at ----, 132 S.Ct., at 2465. Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects " 'unfortunate yet transient immaturity.' " Id., at ----, 132 S.Ct., at 2469 (quoting Roper, 543 U.S., at 573, 125 S.Ct. 1183 ). Because Miller determined that sentencing a child to life without parole is excessive for all but " 'the rare juvenile offender whose crime reflects irreparable corruption,' " 567 U.S., at ----, 132 S.Ct., at 2469 (quoting Roper, supra, at 573, 125 S.Ct. 1183 ), it rendered life without parole an unconstitutional penalty for "a class of defendants because of their status"-that is, juvenile offenders whose crimes reflect the transient immaturity of youth. Penry, 492 U.S., at 330, 109 S.Ct. 2934. As a result, Miller announced a substantive rule of constitutional law. Like other substantive rules, Miller is retroactive because it " 'necessarily carr[ies] a significant risk that a defendant' "-here, the vast majority of juvenile offenders-" 'faces a punishment that the law cannot impose upon him.' " Schriro, 542 U.S., at 352, 124 S.Ct. 2519 (quoting Bousley v. United States, 523 U.S. 614, 620, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) ).
Louisiana nonetheless argues that Miller is procedural because it did not place any punishment beyond the State's power to impose; it instead required sentencing courts to take children's age into account before condemning them to die in prison. In support of this argument, Louisiana points to Miller 's statement that the decision "does not categorically bar a penalty for a class of offenders or type of crime-as, for example, we did in Roper or Graham . Instead, it mandates only that a sentencer follow a certain process-considering an offender's youth and attendant characteristics-before imposing a particular penalty." Miller, supra, at ----, 132 S.Ct., at 2471. Miller , it is true, did not bar a punishment for all juvenile offenders, as the Court did in Roper or Graham. Miller did bar life without parole, however, for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility. For that reason, Miller is no less substantive than are Roper and Graham. Before Miller , every juvenile convicted of a homicide offense could be sentenced to life without parole. After Miller , it will be the rare juvenile offender who can receive that same sentence. The only difference between Roper and Graham, on the one hand, and Miller , on the other hand, is that Miller drew a line between children whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption. The fact that life without parole could be a proportionate sentence for the latter kind of juvenile offender does not mean that all other children imprisoned under a disproportionate sentence have not suffered the deprivation of a substantive right.
To be sure, Miller 's holding has a procedural component. Miller requires a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence. See 567 U.S., at ----, 132 S.Ct., at 2471. Louisiana contends that because Miller requires this process, it must have set forth a procedural rule. This argument, however, conflates a procedural requirement necessary to implement a substantive guarantee with a *735 rule that "regulate[s] only the manner of determining the defendant's culpability." Schriro, supra, at 353, 124 S.Ct. 2519. There are instances in which a substantive change in the law must be attended by a procedure that enables a prisoner to show that he falls within the category of persons whom the law may no longer punish. See Mackey, 401 U.S., at 692, n. 7, 91 S.Ct. 1160 (opinion of Harlan, J.) ("Some rules may have both procedural and substantive ramifications, as I have used those terms here"). For example, when an element of a criminal offense is deemed unconstitutional, a prisoner convicted under that offense receives a new trial where the government must prove the prisoner's conduct still fits within the modified definition of the crime. In a similar vein, when the Constitution prohibits a particular form of punishment for a class of persons, an affected prisoner receives a procedure through which he can show that he belongs to the protected class. See, e.g., Atkins v. Virginia, 536 U.S. 304, 317, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (requiring a procedure to determine whether a particular individual with an intellectual disability "fall[s] within the range of [intellectually disabled] offenders about whom there is a national consensus" that execution is impermissible). Those procedural requirements do not, of course, transform substantive rules into procedural ones.
The procedure Miller prescribes is no different. A hearing where "youth and its attendant characteristics" are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not. 567 U.S., at ----, 132 S.Ct., at 2460. The hearing does not replace but rather gives effect to Miller 's substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity.
Louisiana suggests that Miller cannot have made a constitutional distinction between children whose crimes reflect transient immaturity and those whose crimes reflect irreparable corruption because Miller did not require trial courts to make a finding of fact regarding a child's incorrigibility. That this finding is not required, however, speaks only to the degree of procedure Miller mandated in order to implement its substantive guarantee. When a new substantive rule of constitutional law is established, this Court is careful to limit the scope of any attendant procedural requirement to avoid intruding more than necessary upon the States' sovereign administration of their criminal justice systems. See Ford v. Wainwright, 477 U.S. 399, 416-417, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) ("[W]e leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences"). Fidelity to this important principle of federalism, however, should not be construed to demean the substantive character of the federal right at issue. That Miller did not impose a formal factfinding requirement does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole. To the contrary, Miller established that this punishment is disproportionate under the Eighth Amendment.
For this reason, the death penalty cases Louisiana cites in support of its position are inapposite. See, e.g., Beard v. Banks, 542 U.S. 406, 408, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004) (holding nonretroactive the rule that forbids instructing a jury to disregard mitigating factors not found by a unanimous vote); O'Dell v. Netherland, 521 U.S. 151, 153, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997) (holding nonretroactive the rule providing that, if the prosecutor *736 cites future dangerousness, the defendant may inform the jury of his ineligibility for parole); Sawyer v. Smith, 497 U.S. 227, 229, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990) (holding nonretroactive the rule that forbids suggesting to a capital jury that it is not responsible for a death sentence). Those decisions altered the processes in which States must engage before sentencing a person to death. The processes may have had some effect on the likelihood that capital punishment would be imposed, but none of those decisions rendered a certain penalty unconstitutionally excessive for a category of offenders.
The Court now holds that Miller announced a substantive rule of constitutional law. The conclusion that Miller states a substantive rule comports with the principles that informed Teague . Teague sought to balance the important goals of finality and comity with the liberty interests of those imprisoned pursuant to rules later deemed unconstitutional. Miller 's conclusion that the sentence of life without parole is disproportionate for the vast majority of juvenile offenders raises a grave risk that many are being held in violation of the Constitution.
Giving Miller retroactive effect, moreover, does not require States to relitigate sentences, let alone convictions, in every case where a juvenile offender received mandatory life without parole. A State may remedy a Miller violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them. See, e.g., Wyo. Stat. Ann. § 6-10-301(c) (2013) (juvenile homicide offenders eligible for parole after 25 years). Allowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity-and who have since matured-will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment.
Extending parole eligibility to juvenile offenders does not impose an onerous burden on the States, nor does it disturb the finality of state convictions. Those prisoners who have shown an inability to reform will continue to serve life sentences. The opportunity for release will be afforded to those who demonstrate the truth of Miller 's central intuition-that children who commit even heinous crimes are capable of change.
Petitioner has discussed in his submissions to this Court his evolution from a troubled, misguided youth to a model member of the prison community. Petitioner states that he helped establish an inmate boxing team, of which he later became a trainer and coach. He alleges that he has contributed his time and labor to the prison's silkscreen department and that he strives to offer advice and serve as a role model to other inmates. These claims have not been tested or even addressed by the State, so the Court does not confirm their accuracy. The petitioner's submissions are relevant, however, as an example of one kind of evidence that prisoners might use to demonstrate rehabilitation.
* * *
Henry Montgomery has spent each day of the past 46 years knowing he was condemned to die in prison. Perhaps it can be established that, due to exceptional circumstances, this fate was a just and proportionate punishment for the crime he committed as a 17-year-old boy. In light of what this Court has said in Roper, Graham, and Miller about how children are constitutionally different from adults in their level of culpability, however, prisoners like Montgomery must be given the opportunity to show their crime did not reflect irreparable corruption; and, if it *737 did not, their hope for some years of life outside prison walls must be restored.
The judgment of the Supreme Court of Louisiana is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.
It is so ordered.
Justice SCALIA, with whom Justice THOMAS and Justice ALITO join, dissenting.
The Court has no jurisdiction to decide this case, and the decision it arrives at is wrong. I respectfully dissent.
I. Jurisdiction
Louisiana postconviction courts willingly entertain Eighth Amendment claims but, with limited exceptions, apply the law as it existed when the state prisoner was convicted and sentenced. Shortly after this Court announced Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), the Louisiana Supreme Court adopted Teague 's framework to govern the provision of postconviction remedies available to state prisoners in its state courts as a matter of state law. Taylor v. Whitley, 606 So.2d 1292 (La.1992). In doing so, the court stated that it was "not bound" to adopt that federal framework. Id., at 1296. One would think, then, that it is none of our business that a 69-year-old Louisiana prisoner's state-law motion to be resentenced according to Miller v. Alabama, 567 U.S. ----, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), a case announced almost half a century after his sentence was final, was met with a firm rejection on state-law grounds by the Louisiana Supreme Court. But a majority of this Court, eager to reach the merits of this case, resolves the question of our jurisdiction by deciding that the Constitution requires state postconviction courts to adopt Teague 's exception for so-called "substantive" new rules and to provide state-law remedies for the violations of those rules to prisoners whose sentences long ago became final. This conscription into federal service of state postconviction courts is nothing short of astonishing.
A
Teague announced that federal courts could not grant habeas corpus to overturn state convictions on the basis of a "new rule" of constitutional law-meaning one announced after the convictions became final-unless that new rule was a "substantive rule" or a "watershed rul[e] of criminal procedure." 489 U.S., at 311, 109 S.Ct. 1060. The Teague prescription followed from Justice Harlan's view of the "retroactivity problem" detailed in his separate opinion in Desist v. United States, 394 U.S. 244, 256, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969) (dissenting opinion), and later in Mackey v. United States, 401 U.S. 667, 675, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971) (opinion concurring in judgment in part and dissenting in part). Placing the rule's first exception in context requires more analysis than the majority has applied.
The Court in the mid-20th century was confounded by what Justice Harlan called the "swift pace of constitutional change," Pickelsimer v. Wainwright, 375 U.S. 2, 4, 84 S.Ct. 80, 11 L.Ed.2d 41 (1963) (dissenting opinion), as it vacated and remanded many cases in the wake of Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Justice Harlan called upon the Court to engage in "informed and deliberate consideration" of "whether the States are constitutionally required to apply [Gideon 's] new rule retrospectively, which may well require the reopening of cases long since finally adjudicated in accordance with then applicable decisions of this Court." Pickelsimer, supra, at 3, 84 S.Ct. 80. The Court answered that call in *738 Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). Linkletter began with the premise "that we are neither required to apply, nor prohibited from applying, a decision retrospectively" and went on to adopt an equitable rule-by-rule approach to retroactivity, considering "the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." Id., at 629, 85 S.Ct. 1731.
The Linkletter framework proved unworkable when the Court began applying the rule-by-rule approach not only to cases on collateral review but also to cases on direct review, rejecting any distinction "between convictions now final" and "convictions at various stages of trial and direct review." Stovall v. Denno, 388 U.S. 293, 300, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). It was this rejection that drew Justice Harlan's reproach in Desist and later in Mackey . He urged that "all 'new' rules of constitutional law must, at a minimum, be applied to all those cases which are still subject to direct review by this Court at the time the 'new' decision is handed down." Desist, supra, at 258, 89 S.Ct. 1030 (dissenting opinion). "Simply fishing one case from the stream of appellate review, using it as a vehicle for pronouncing new constitutional standards, and then permitting a stream of similar cases subsequently to flow by unaffected by that new rule constitute an indefensible departure from th[e] model of judicial review." Mackey, supra, at 679, 91 S.Ct. 1160.
The decision in Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), heeded this constitutional concern. The Court jettisoned the Linkletter test for cases pending on direct review and adopted for them Justice Harlan's rule of redressability: "[F]ailure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication." 479 U.S., at 322, 107 S.Ct. 708 (emphasis added). We established in Griffith that this Court must play by our own "old rules"-rules we have settled before the defendant's conviction and sentence become final, even those that are a "clear break from existing precedent"-for cases pending before us on direct appeal. Id., at 323, 107 S.Ct. 708. Since the Griffith rule is constitutionally compelled, we instructed the lower state and federal courts to comply with it as well. Ibid.
When Teague followed on Griffith 's heels two years later, the opinion contained no discussion of "basic norms of constitutional adjudication," Griffith, supra, at 322, 107 S.Ct. 708, nor any discussion of the obligations of state courts. Doing away with Linkletter for good, the Court adopted Justice Harlan's solution to "the retroactivity problem" for cases pending on collateral review-which he described not as a constitutional problem but as "a problem as to the scope of the habeas writ ." Mackey, supra, at 684, 91 S.Ct. 1160 (emphasis added). Teague held that federal habeas courts could no longer upset state-court convictions for violations of so-called "new rules," not yet announced when the conviction became final. 489 U.S., at 310, 109 S.Ct. 1060. But it allowed for the previously mentioned exceptions to this rule of nonredressability: substantive rules placing "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe" and "watershed rules of criminal procedure." Id., at 311, 109 S.Ct. 1060. Then in Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), the Court expanded this first exception for substantive rules to embrace new rules "prohibiting a certain category of punishment for a class of defendants because of their status or offense." Id., at 330, 109 S.Ct. 2934.
*739 Neither Teague nor its exceptions are constitutionally compelled. Unlike today's majority, the Teague- era Court understood that cases on collateral review are fundamentally different from those pending on direct review because of "considerations of finality in the judicial process." Shea v. Louisiana, 470 U.S. 51, 59-60, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985). That line of finality demarcating the constitutionally required rule in Griffith from the habeas rule in Teague supplies the answer to the not-so-difficult question whether a state postconviction court must remedy the violation of a new substantive rule: No. A state court need only apply the law as it existed at the time a defendant's conviction and sentence became final. See Griffith, supra, at 322, 107 S.Ct. 708. And once final, "a new rule cannot reopen a door already closed." James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 541, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991) (opinion of Souter, J.). Any relief a prisoner might receive in a state court after finality is a matter of grace, not constitutional prescription.
B
The majority can marshal no case support for its contrary position. It creates a constitutional rule where none had been before: "Teague 's conclusion establishing the retroactivity of new substantive rules is best understood as resting upon constitutional premises" binding in both federal and state courts. Ante, at 729. "Best understood." Because of what? Surely not because of its history and derivation.
Because of the Supremacy Clause, says the majority. Ante, at 731. But the Supremacy Clause cannot possibly answer the question before us here. It only elicits another question: What federal law is supreme? Old or new? The majority's champion, Justice Harlan, said the old rules apply for federal habeas review of a state-court conviction: "[T]he habeas court need only apply the constitutional standards that prevailed at the time the original proceedings took place," Desist, 394 U.S., at 263, 89 S.Ct. 1030 (dissenting opinion), for a state court cannot "toe the constitutional mark" that does not yet exist, Mackey, 401 U.S., at 687, 91 S.Ct. 1160 (opinion of Harlan, J.). Following his analysis, we have clarified time and again-recently in Greene v. Fisher, 565 U.S. ----, ---- - ----, 132 S.Ct. 38, 43-44, 181 L.Ed.2d 336 (2011) -that federal habeas courts are to review state-court decisions against the law and factual record that existed at the time the decisions were made. "Section 2254(d)(1) [of the federal habeas statute] refers, in the past tense, to a state-court adjudication that 'resulted in' a decision that was contrary to, or 'involved' an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made." Cullen v. Pinholster, 563 U.S. 170, 181-182, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011). How can it possibly be, then, that the Constitution requires a state court's review of its own convictions to be governed by "new rules" rather than (what suffices when federal courts review state courts) "old rules"?
The majority relies on the statement in United States v. United States Coin & Currency, 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971), that " '[n]o circumstances call more for the invocation of a rule of complete retroactivity' " than when " 'the conduct being penalized is constitutionally immune from punishment.' " Ante, at 729 - 730 (quoting 401 U.S., at 724, 91 S.Ct. 1041 ). The majority neglects to mention that this statement was addressing the "circumstances" of a conviction that "had not become final, " id ., at 724, n. 13, 91 S.Ct. 1041 (emphasis added), when *740 the "rule of complete retroactivity" was invoked. Coin & Currency, an opinion written by (guess whom?) Justice Harlan, merely foreshadowed the rule announced in Griffith, that all cases pending on direct review receive the benefit of newly announced rules-better termed "old rules" for such rules were announced before finality.
The majority also misappropriates Yates v. Aiken, 484 U.S. 211, 108 S.Ct. 534, 98 L.Ed.2d 546 (1988), which reviewed a state habeas petitioner's Fourteenth Amendment claim that the jury instructions at his trial lessened the State's burden to prove every element of his offense beyond a reasonable doubt. That case at least did involve a conviction that was final. But the majority is oblivious to the critical fact that Yates's claim depended upon an old rule, settled at the time of his trial. Id., at 217, 108 S.Ct. 534. This Court reversed the state habeas court for its refusal to consider that the jury instructions violated that old rule . Ibid . The majority places great weight upon the dictum in Yates that the South Carolina habeas court " 'ha [d] a duty to grant the relief that federal law requires.' " Ante, at 731 (quoting Yates, supra, at 218, 108 S.Ct. 534 ). It is simply wrong to divorce that dictum from the facts it addressed. In that context, Yates merely reinforces the line drawn by Griffith : when state courts provide a forum for postconviction relief, they need to play by the "old rules" announced before the date on which a defendant's conviction and sentence became final.
The other sleight of hand performed by the majority is its emphasis on Ex parte Siebold, 100 U.S. 371, 25 L.Ed. 717 (1880). That case considered a petition for a federal writ of habeas corpus following a federal conviction, and the initial issue it confronted was its jurisdiction. A federal court has no inherent habeas corpus power, Ex parte Bollman, 4 Cranch 75, 94, 2 L.Ed. 554 (1807), but only that which is conferred (and limited) by statute, see, e.g., Felker v. Turpin, 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996). As Siebold stated, it was forbidden to use the federal habeas writ "as a mere writ of error." 100 U.S., at 375. "The only ground on which this court, or any court, without some special statute authorizing it, [could] give relief on habeas corpus to a prisoner under conviction and sentence of another court is the want of jurisdiction in such court over the person or the cause, or some other matter rendering its proceedings void." Ibid. Turning to the facts before it, the Court decided it was within its power to hear Siebold's claim, which did not merely protest that the conviction and sentence were "erroneous" but contended that the statute he was convicted of violating was unconstitutional and the conviction therefore void: "[I]f the laws are unconstitutional and void, the Circuit Court acquired no jurisdiction of the causes." Id., at 376-377. Siebold is thus a decision that expands the limits of this Court's power to issue a federal habeas writ for a federal prisoner.
The majority, however, divines from Siebold "a general principle" that "a court has no authority to leave in place a conviction or sentence that violates a substantive rule, regardless of whether the conviction or sentence became final before the rule was announced." Ante, at 731. That is utterly impossible. No "general principle" can rationally be derived from Siebold about constitutionally required remedies in state courts; indeed, the opinion does not even speak to constitutionally required remedies in federal courts. It is a decision about this Court's statutory power to grant the Original Writ, not about its constitutional obligation to do so. Nowhere in Siebold did this Court intimate that relief was constitutionally required-or as the *741 majority puts it, that a court would have had "no authority" to leave in place Siebold's conviction, ante, at 730 - 731.
The majority's sorry acknowledgment that "Siebold and the other cases discussed in this opinion, of course, do not directly control the question the Court now answers for the first time," ibid., is not nearly enough of a disclaimer. It is not just that they "do not directly control," but that the dicta cherry picked from those cases are irrelevant; they addressed circumstances fundamentally different from those to which the majority now applies them. Indeed, we know for sure that the author of some of those dicta, Justice Harlan, held views that flatly contradict the majority.
The majority's maxim that "state collateral review courts have no greater power than federal habeas courts to mandate that a prisoner continue to suffer punishment barred by the Constitution," ante, at 731, begs the question rather than contributes to its solution. Until today, no federal court was constitutionally obliged to grant relief for the past violation of a newly announced substantive rule. Until today, it was Congress's prerogative to do away with Teague 's exceptions altogether. Indeed, we had left unresolved the question whether Congress had already done that when it amended a section of the habeas corpus statute to add backward-looking language governing the review of state-court decisions. See Antiterrorism and Effective Death Penalty Act of 1996, § 104, 110 Stat. 1219, codified at 28 U.S.C. § 2254(d)(1) ; Greene, 565 U.S., at ----, n., 132 S.Ct., at 44, n. A maxim shown to be more relevant to this case, by the analysis that the majority omitted, is this: The Supremacy Clause does not impose upon state courts a constitutional obligation it fails to impose upon federal courts.
C
All that remains to support the majority's conclusion is that all-purpose Latin canon: ipse dixit . The majority opines that because a substantive rule eliminates a State's power to proscribe certain conduct or impose a certain punishment, it has "the automatic consequence of invalidating a defendant's conviction or sentence." Ante, at 730. What provision of the Constitution could conceivably produce such a result? The Due Process Clause? It surely cannot be a denial of due process for a court to pronounce a final judgment which, though fully in accord with federal constitutional law at the time, fails to anticipate a change to be made by this Court half a century into the future. The Equal Protection Clause? Both statutory and (increasingly) constitutional laws change. If it were a denial of equal protection to hold an earlier defendant to a law more stringent than what exists today, it would also be a denial of equal protection to hold a later defendant to a law more stringent than what existed 50 years ago. No principle of equal protection requires the criminal law of all ages to be the same.
The majority grandly asserts that "[t]here is no grandfather clause that permits States to enforce punishments the Constitution forbids ." Ante, at 731 (emphasis added). Of course the italicized phrase begs the question. There most certainly is a grandfather clause-one we have called finality -which says that the Constitution does not require States to revise punishments that were lawful when they were imposed. Once a conviction has become final, whether new rules or old ones will be applied to revisit the conviction is a matter entirely within the State's control; the Constitution has nothing to say about that choice. The majority says that there is no "possibility of a valid result" when a new substantive rule is not *742 applied retroactively. Ante, at 729 - 730. But the whole controversy here arises because many think there is a valid result when a defendant has been convicted under the law that existed when his conviction became final. And the States are unquestionably entitled to take that view of things.
The majority's imposition of Teague 's first exception upon the States is all the worse because it does not adhere to that exception as initially conceived by Justice Harlan-an exception for rules that "place, as a matter of constitutional interpretation, certain kinds of primary, private individual conduct beyond the power of the criminal lawmaking authority to proscribe." Mackey, 401 U.S., at 692, 91 S.Ct. 1160 (emphasis added). Rather, it endorses the exception as expanded by Penry, to include "rules prohibiting a certain category of punishment for a class of defendants because of their status or offense." 492 U.S., at 330, 109 S.Ct. 2934. That expansion empowered and obligated federal (and after today state) habeas courts to invoke this Court's Eighth Amendment "evolving standards of decency" jurisprudence to upset punishments that were constitutional when imposed but are "cruel and unusual," U.S. Const., Amdt. 8, in our newly enlightened society. See Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). The "evolving standards" test concedes that in 1969 the State had the power to punish Henry Montgomery as it did. Indeed, Montgomery could at that time have been sentenced to death by our yet unevolved society. Even 20 years later, this Court reaffirmed that the Constitution posed no bar to death sentences for juveniles. Stanford v. Kentucky, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). Not until our People's "standards of decency" evolved a mere 10 years ago-nearly 40 years after Montgomery's sentence was imposed-did this Court declare the death penalty unconstitutional for juveniles. Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). Even then, the Court reassured States that "the punishment of life imprisonment without the possibility of parole is itself a severe sanction," implicitly still available for juveniles. Id., at 572, 125 S.Ct. 1183. And again five years ago this Court left in place this severe sanction for juvenile homicide offenders. Graham v. Florida, 560 U.S. 48, 69, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). So for the five decades Montgomery has spent in prison, not one of this Court's precedents called into question the legality of his sentence-until the People's "standards of decency," as perceived by five Justices, "evolved" yet again in Miller .
Teague 's central purpose was to do away with the old regime's tendency to "continually force the States to marshal resources in order to keep in prison defendants whose trials and appeals conformed to then-existing constitutional standards." 489 U.S., at 310, 109 S.Ct. 1060. Today's holding thwarts that purpose with a vengeance. Our ever-evolving Constitution changes the rules of "cruel and unusual punishments" every few years. In the passage from Mackey that the majority's opinion quotes, ante, at 731 - 732, Justice Harlan noted the diminishing force of finality (and hence the equitable propriety-not the constitutional requirement-of disregarding it) when the law punishes nonpunishable conduct, see 401 U.S., at 693, 91 S.Ct. 1160. But one cannot imagine a clearer frustration of the sensible policy of Teague when the ever-moving target of impermissible punishments is at issue. Today's holding not only forecloses Congress from eliminating this expansion of Teague in federal courts, but also foists this distortion upon the States.
II. The Retroactivity of Miller
Having created jurisdiction by ripping Teague 's first exception from its moorings, *743 converting an equitable rule governing federal habeas relief to a constitutional command governing state courts as well, the majority proceeds to the merits. And here it confronts a second obstacle to its desired outcome. Miller , the opinion it wishes to impose upon state postconviction courts, simply does not decree what the first part of the majority's opinion says Teague 's first exception requires to be given retroactive effect: a rule "set[ting] forth categorical constitutional guarantees that place certain criminal laws and punishments altogether beyond the State's power to impose." Ante, at 729 (emphasis added). No problem. Having distorted Teague, the majority simply proceeds to rewrite Miller .
The majority asserts that Miller "rendered life without parole an unconstitutional penalty for 'a class of defendants because of their status'-that is, juvenile offenders whose crimes reflect the transient immaturity of youth." Ante, at 734. It insists that Miller barred life-without-parole sentences "for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility. For that reason, Miller is no less substantive than are Roper and Graham. " Ante, at 734. The problem is that Miller stated, quite clearly, precisely the opposite: "Our decision does not categorically bar a penalty for a class of offenders or type of crime-as, for example, we did in Roper or Graham . Instead, it mandates only that a sentencer follow a certain process -considering an offender's youth and attendant characteristics-before imposing a particular penalty." 567 U.S., at ----, 132 S.Ct., at 2471 (emphasis added).
To contradict that clear statement, the majority opinion quotes passages from Miller that assert such things as "mandatory life-without-parole sentences for children 'pos[e] too great a risk of disproportionate punishment' " and " 'appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.' " Ante, at 733 - 734 (quoting Miller, supra, at ----, 132 S.Ct., at 2469 ). But to say that a punishment might be inappropriate and disproportionate for certain juvenile offenders is not to say that it is unconstitutionally void. All of the statements relied on by the majority do nothing more than express the reason why the new, youth-protective procedure prescribed by Miller is desirable: to deter life sentences for certain juvenile offenders. On the issue of whether Miller rendered life-without-parole penalties unconstitutional, it is impossible to get past Miller 's unambiguous statement that "[o]ur decision does not categorically bar a penalty for a class of offenders" and "mandates only that a sentencer follow a certain process ... before imposing a particular penalty." 567 U.S., at ----, 132 S.Ct., at 2471. It is plain as day that the majority is not applying Miller , but rewriting it.[1]
And the rewriting has consequences beyond merely making Miller 's procedural guarantee retroactive. If, indeed, a State is categorically prohibited from imposing life without parole on juvenile offenders whose crimes do not "reflect permanent incorrigibility," then even when the procedures that Miller demands are provided the constitutional requirement is not necessarily satisfied. It remains available for *744 the defendant sentenced to life without parole to argue that his crimes did not in fact "reflect permanent incorrigibility." Or as the majority's opinion puts it: "That Miller did not impose a formal factfinding requirement does not leave States free to sentence a child [2 ]whose crime reflects transient immaturity to life without parole. To the contrary, Miller established that this punishment is disproportionate under the Eighth Amendment." Ante, at 735.
How wonderful. Federal and (like it or not) state judges are henceforth to resolve the knotty "legal" question: whether a 17-year-old who murdered an innocent sheriff's deputy half a century ago was at the time of his trial "incorrigible." Under Miller , bear in mind, the inquiry is whether the inmate was seen to be incorrigible when he was sentenced-not whether he has proven corrigible and so can safely be paroled today. What silliness. (And how impossible in practice, see Brief for National District Attorneys Assn. et al. as Amici Curiae 9-17.) When in Lockett v. Ohio, 438 U.S. 586, 608, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Court imposed the thitherto unheard-of requirement that the sentencer in capital cases must consider and weigh all "relevant mitigating factors," it at least did not impose the substantive (and hence judicially reviewable) requirement that the aggravators must outweigh the mitigators; it would suffice that the sentencer thought so. And, fairly read, Miller did the same. Not so with the "incorrigibility" requirement that the Court imposes today to make Miller retroactive.
But have no fear. The majority does not seriously expect state and federal collateral-review tribunals to engage in this silliness, probing the evidence of "incorrigibility" that existed decades ago when defendants were sentenced. What the majority expects (and intends) to happen is set forth in the following not-so-subtle invitation: "A State may remedy a Miller violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." Ante, at 736. Of course. This whole exercise, this whole distortion of Miller , is just a devious way of eliminating life without parole for juvenile offenders. The Court might have done that expressly (as we know, the Court can decree anything ), but that would have been something of an embarrassment. After all, one of the justifications the Court gave for decreeing an end to the death penalty for murders (no matter how many) committed by a juvenile was that life without parole was a severe enough punishment. See Roper, 543 U.S., at 572, 125 S.Ct. 1183. How could the majority-in an opinion written by the very author of Roper -now say that punishment is also unconstitutional? The Court expressly refused to say so in Miller . 567 U.S., at ----, 132 S.Ct., at 2469. So the Court refuses again today, but merely makes imposition of that severe sanction a practical impossibility. And then, in Godfather fashion, the majority makes state legislatures an offer they can't refuse: Avoid all the utterly impossible nonsense we have prescribed by simply "permitting juvenile homicide offenders to be considered for parole." Ante, at 736. Mission accomplished.

It is amusing that the majority's initial description of Miller is the same as our own: "[T]he Court held that a juvenile convicted of a homicide offense could not be sentenced to life in prison without parole absent consideration of the juvenile's special circumstances in light of the principles and purposes of juvenile sentencing." Ante, at 725. Only 15 pages later, after softening the reader with 3 pages of obfuscating analysis, does the majority dare to attribute to Miller that which Miller explicitly denies.

The majority presumably regards any person one day short of voting age as a "child."