Egan Jr., J.
(concurring in part and dissenting in part). On May 15, 1976, the victim’s parents called the police to report that their 14-year-old daughter was missing. An investigation and search immediately began and, after it was discovered that petitioner — the victim’s 16-year-old former boyfriend — had *42 been with the victim on the day that she was last seen, petitioner was questioned by the authorities. Petitioner denied having any knowledge of the victim’s whereabouts and actively participated in the search for her from May 1976 to March 1977 — perpetuating her family’s hope that she was still alive and participating in what aptly has been described as a hoax, casting himself in the role of a desperate teenager frantically searching for the girl he loved. In reality, however, petitioner— purportedly “distraught” over the victim’s decision to acquiesce to her parents’ wishes and break up with him — had devised a plan to lure the victim to a secluded location whereupon he would kill the victim and then kill himself.[1] Petitioner partially executed that plan — strangling the victim with a shirt and hiding her body in a 55-gallon drum, which he then placed inside a 12-foot shaft of an abandoned shipyard located at the tip of Staten Island. The victim’s badly decomposed remains were not discovered until nearly two years later.
In the interim, petitioner continued to deny any involvement in or responsibility for the crime and, recognizing that he “wouldn’t be able to uphold the facade” that he had created if he remained in the area, eventually left to live in another state. Petitioner remained out of state — attending high school — for approximately one year, until his decision to confide in certain friends resulted in his eventual arrest and prosecution. In 1979, petitioner was sentenced upon his conviction of murder in the second degree to a prison term of 22 years to life.[2] Since becoming eligible for parole release in 2000, petitioner has been denied release nine times based upon, among other things, the nature of the underlying crime, which has been variously — and appropriately — described as extremely serious, heinous and bizarre. The majority now proposes to afford petitioner a de novo parole hearing, finding that he has not been afforded a *43 “meaningful opportunity to obtain release” (Graham v Florida, 560 US 48, 75 [2010]) and, further, that the Eighth Amendment and the cases interpreting its application to juvenile offenders (see Montgomery v Louisiana, 577 US —, 136 S Ct 718 [2016]; Miller v Alabama, 567 US —, 132 S Ct 2455 [2012]; Graham v Florida, 560 US at 75) impose upon respondent Board of Parole a requirement that it expressly consider — in the context of petitioner’s parole determination — petitioner’s “youth and its attendant characteristics” in relationship to the murder that he committed nearly 40 years ago.
We agree that Supreme Court erred in precluding one of the Board’s commissioners from participating in any subsequent parole hearing involving petitioner and, to that limited extent, we concur in the majority’s decision. As to the balance, however, we are satisfied that New York’s sentencing and parole procedures afford petitioner a “meaningful opportunity to obtain release” (Graham v Florida, 560 US at 75), which is all that Graham, Miller, Montgomery and the Eighth Amendment itself require. Because we are of the view that no constitutional violation occurred here, we respectfully dissent and would reverse Supreme Court’s judgment in its entirety and dismiss the petition.
Although the majority’s decision discusses at length the characteristics that distinguish juvenile offenders from adult offenders and explores the reasons why traditional penological goals — retribution, deterrence, incapacitation and rehabilitation — do not, in all but the rarest of cases, justify imposing the most severe sentence possible upon someone who commits a crime before he or she is 18 years old, it glosses over the underlying factual differences that distinguish petitioner from the defendants in Graham, Miller and Montgomery — the most notable of which being that, unlike the defendants in those cases, petitioner was not actually sentenced to life in prison without the possibility of parole. In Graham, the 16-year-old defendant was sentenced to, among other things, life in prison following his conviction of armed burglary. As the state in which he was sentenced (Florida) had abolished its parole system, such defendant was — absent executive clemency — facing life in prison without any possibility of parole (Graham v Florida, 560 US at 57). The Supreme Court of the United States held that the Eighth Amendment prohibited a state from imposing a sentence of life without the possibility of parole upon a juvenile nonhomicide offender (id. at 74) — a determina *44 tion grounded in the belief that a state cannot determine, at the time of sentencing, that such an offender “never will be fit to reenter society” (id. at 75). In reaching that conclusion, the Court cautioned that the Eighth Amendment does not require a state to release a juvenile offender during his or her lifetime; rather, the state need only afford the juvenile offender “some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation” (id.). The differences between petitioner and the defendant in Graham are readily apparent — namely, that petitioner was convicted of murder and was sentenced to a prison term of 22 years to life in a state with an active parole system. Indeed, having appeared before the Board on multiple occasions, there is no question that petitioner has been afforded an opportunity for release— the adequacy of which will be discussed infra.
The factual circumstances presented in Miller and Montgomery are equally distinguishable from the matter now before this Court. In Miller, the defendants were convicted of murder in a state where the sentencing statutes “mandated that each juvenile die in prison even if a judge or jury would have thought that his youth and its attendant characteristics, along with the nature of his crime, made a lesser sentence (for example, life with the possibility of parole) more appropriate” (Miller v Alabama, 567 US at —, 132 S Ct at 2460). The requirement “that all children convicted of homicide receive lifetime incarceration without possibility of parole” (567 US at —, 132 S Ct at 2475) and the corresponding divestiture of any discretion to impose a lesser sentence prompted the Court to conclude “that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment’s prohibition on cruel and unusual punishments” (567 US at —, 132 S Ct at 2460 [emphasis added, internal quotation marks omitted]). Again, petitioner was not sentenced to life without the possibility of parole, nor was he subject to a mandatory sentencing scheme such as the one at issue in Miller.
The Court’s decision in Montgomery was even more narrowly tailored — primarily focusing upon whether Miller had announced a new rule of substantive law that, in turn, was entitled to retroactive effect, i.e., whether the holding in Miller applied to a juvenile defendant who was convicted in 1969 and, under Louisiana law, automatically received a mandatory sentence of life without the possibility of parole (Montgomery v Louisiana, 577 US at —, 136 S Ct at 725-726). The Court *45 answered that inquiry in the affirmative, noting that “[a] [s]tate may remedy a Miller violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them” (577 US at —, 136 S Ct at 736). While the Court indeed made clear that such offenders “must be given the opportunity to show [that] their crime did not reflect irreparable corruption,” it also reiterated that “[t]hose prisoners who have shown an inability to reform will continue to serve life sentences” (577 US at —, 136 S Ct at 736).
Even setting aside these factual distinctions and assuming, as the majority posits, that petitioner falls within the ambit of Graham and its progeny[3] and, further, that the sentencing procedures at issue in those cases and the parole determination under review here are governed by the same procedural safeguards[4] the key principle to be extracted from Graham, Miller and Montgomery — that, in order to avoid an Eighth Amendment violation, a juvenile offender must be given “some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation” (Graham v Florida, 560 US at 75) — was, in our view, honored here. Executive Law *46 § 259-i establishes a procedure for affording inmates such as petitioner discretionary release and sets forth the criteria that the Board must consider in determining whether to grant release on parole (see Executive Law § 259-i [2] [c] [A]). Among the criteria contained therein is “the seriousness of the offense with due consideration to the type of sentence, length of sentence and recommendations of the sentencing court, ... as well as consideration of any mitigating and aggravating factors, and activities following arrest prior to confinement” (Executive Law § 259-i [2] [c] [A] [vii]).
Age at the time of the offense, together with what the Supreme Court of the United States has characterized as a juvenile’s corresponding lack of maturity, sense of responsibility and insight and increased risk of impulsivity and recklessness, certainly would qualify as mitigating factors within the meaning of the statute and could properly be considered by the Board in assessing whether a particular individual should be released on parole.[5] Indeed, a review of the transcripts of petitioner’s various appearances before the Board, including his most recent hearing in March 2014, reveals that petitioner repeatedly raised — and the Board indeed was aware of and considered — petitioner’s age and asserted lack of maturity at the time of the offense.[6] As this Court has made abundantly clear, “the Board [is] not required to give each statutory factor equal weight” and, indeed, may place greater emphasis upon the serious nature of the underlying crime (Matter of King v Stanford, 137 AD3d 1396, 1397 [2016]; see Matter of Feilzer v New York State Div. of Parole, 131 AD3d 1321, 1322 [2015]; Matter of Leung v Evans, 120 AD3d 1478, 1479 [2014], lv denied 24 NY3d 914 [2015]). Further, while the Board must state the reasons for a denial of parole “in detail” (Executive Law § 259-i [2] [a] [i]), it need not expressly recite each and every factor that it considered in reaching its determination, nor must it *47 discuss such factors at length (see Matter of Duffy v New York State Dept. of Corr. & Community Supervision, 132 AD3d 1207, 1208 [2015]; Matter of Leung v Evans, 120 AD3d at 1479; Matter of Montane v Evans, 116 AD3d 197, 203 [2014], appeal dismissed 24 NY3d 1052 [2014]). Upon reviewing the transcript of petitioner’s March 2014 appearance before the Board, we are satisfied that the Board properly and adequately considered petitioner’s age and asserted immaturity at the time of the offense before denying him discretionary release. As the Board’s determination does not exhibit “irrationality bordering on impropriety” (Matter of Silmon v Travis, 95 NY2d 470, 476 [2000] [internal quotation marks and citation omitted]) and, for the reasons previously discussed, does not run afoul of the Eighth Amendment, it should not be disturbed.
Garry, J., concurs in a separate opinion in which Lynch, J., concurs; Egan Jr., J., concurs in part and dissents in part in a separate opinion in which Rose, J., concurs.
Ordered that the judgment is modified, on the law, without costs, by reversing so much thereof as precluded a particular commissioner of respondent Board of Parole from participating in any future parole proceeding regarding petitioner, and, as so modified, affirmed.

. When asked years later why he killed the victim, petitioner replied, “I felt that I was in love with her. I felt sexually obsessed. I couldn’t possibly envision someone else with her, and I felt the only — it’s foolish to say, and ludicrous, that I felt the only way to end my pain was through murder.” When asked why he participated in the search for the victim, petitioner stated, “Because I was trying to maintain my facade of innocence. I felt if I didn’t participate, I would be looked at as a suspect, and I was doing my best to evade my act.” Petitioner further acknowledged that his participation in the search was, at times, designed to “sabotage” the search effort and “steer [searchers] away from where the [victim’s] body was” located.

. Although petitioner allegedly admitted his crime to certain court security officers after the jury returned its verdict, he did not acknowledge his guilt to the victim’s family until 1989 or 1990.

. To the extent that the majority suggests that the sentence actually imposed upon petitioner — 22 years to life — is the functional equivalent of being sentenced to life in prison without the possibility of parole, we disagree. As noted previously, petitioner was not subject to the mandatory sentencing schemes at issue in Miller and Montgomery, and his multiple appearances before the Board belie any assertion that a determination was made, at the time of sentencing, that he “never [would] be fit to reenter society” (Graham v Florida, 560 US at 75). More to the point, the mere fact that petitioner may well spend the rest of his life in prison is not dispositive, as nothing in Graham, Miller or Montgomery either compels the eventual release of a juvenile offender such as petitioner or — in all instances — forecloses the possibility that such an offender will die in prison. Hence, there is a strong argument to be made that the holdings embodied in the cited cases do not extend to petitioner in the first instance.

. The majority’s conclusion that petitioner’s parole determination is subject to the same procedural safeguards — and must satisfy the same constitutional mandates — as those applicable to the sentencing of a juvenile offender to a prison term of life without the possibility of parole is, again, based upon a faulty premise — namely, that denying petitioner parole, after due consideration of all of the statutory factors set forth in Executive Law § 259-i — is the same as having sentenced petitioner to life in prison without the possibility of parole in the first instance. As we believe that the sentencing and parole phases of a criminal matter, as well as the interests and reasonable expectations of an offender facing life in prison with no possibility of parole versus an offender eligible for and seeking discretionary relief, are fundamentally different, we do not subscribe to the notion that the Eighth Amendment compels the Board to expressly consider petitioner’s “youth and its attendant characteristics” in evaluating the propriety of his release.

. Although the majority suggests that it is inappropriate to expect a potential parolee such as petitioner to raise such factors before the Board, we do not see this as an unduly onerous burden to impose upon someone seeking discretionary release.

. For example, when petitioner appeared before the Board in 2000, one of the commissioners observed that petitioner’s “insight and depth of evaluation of the whole situation was pretty weak at [the time of the offense], not very well developed.” Further, petitioner expressly raised his age and lack of maturity at his appearances before the Board in 2002, 2010 and 2014— drawing a distinction between the “well-balanced adult” he sees himself as today and the “irrational 16 year old” he was in 1976 and insisting that he is “not an incorrigible career criminal.”