EGAN, J. pro tempore, dissenting.
The majority concludes that the nearly 112-year aggregate sentence imposed on petitioner is permissible because petitioner is "within the class of juveniles who, as Miller [v. Alabama , 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed. 2d 407 (2012) ] recognized, may be sentenced to life without the possibility of parole." Kinkel v. Persson , 363 Or. 1, 27, 417 P.3d 401, 415 (2018). That exception, as quoted by the majority, is as follows:
"Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects unfortunate yet transient immaturity. Because Miller determined that sentencing a child to life without parole is excessive for all but the rare juvenile offender whose crime reflects irreparable corruption , it rendered life without *418 parole an unconstitutional penalty for a class of defendants because of their status-that is, juvenile offenders whose crimes reflect the transient immaturity of youth."
Montgomery v. Louisiana , --- U.S. ----, 136 S.Ct. 718, 734, 193 L.Ed. 2d 599 (2016) (internal citations and quotation marks omitted; emphasis added). Because the majority's conclusion is based on an incomplete reading of that exception and the mistaken belief that petitioner's youth played no role in his crimes, I dissent.
In Miller , the Supreme Court began with the principle that it had established in Roper v. Simmons , 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed. 2d 1 (2005) and Graham v. Florida , 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed. 2d 825 (2010), that "children are constitutionally different from adults for purposes of sentencing." Miller , 567 U.S. at 471, 132 S.Ct. 2455. The Court noted that "developments in psychology and brain science continued to show fundamental differences between juvenile and adult minds" and that "[i]t is increasingly clear that adolescent brains are not yet fully mature in regions and **32 systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance." Id. at 471-72, 472, 132 S.Ct. 2455 n 5 (internal quotation marks omitted). The Court added that those characteristics-transient rashness, proclivity for risk, and inability to assess consequences-both lessened a child's moral culpability and "enhanced the prospect that, as the years go by and neurological development occurs, his deficiencies will be reformed." Id. at 472, 132 S.Ct. 2455 ((internal quotation marks omitted).
Additionally, in light of those differences, Miller recognized that the distinctive attributes of youth diminish the penological justifications for imposing on child-offenders life sentences without the possibility of release. Id. The case for retribution in sentencing, which is related to an offender's blameworthiness, is weakened when the offender is a juvenile. Id. The deterrence rationale is weakened because the same characteristics that cause juveniles to be less culpable than adults-immaturity, recklessness, and impetuosity-make them less likely to consider potential punishment. Id. The justification for incapacitation is also weakened because ordinary adolescent development reduces the likelihood that a juvenile offender will forever will be a danger to the community. Id. Lastly, the principle of rehabilitation cannot justify the sentence of life without the possibility of release because it necessarily rejects that possibility of reform. Id.
Those considerations form the basis for the Court's holding in Miller that a sentencing court must, before sentencing a juvenile to life without parole, take into account how children are different and how those differences counsel against irrevocably sentencing them to a lifetime in prison. Montgomery , 136 S.Ct. at 733-34. Miller recognized that, in light of children's diminished culpability and heightened capacity for change, it would be "the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified." Montgomery , 136 S.Ct. at 733. That bar is extremely high because life without the possibility of parole, according to the Court, is comparable to the death penalty in terms of severity when applied to a juvenile. See Graham , 560 U.S. at 69-70, 130 S.Ct. 2011.
**33 In this case, the majority concludes that petitioner's nearly 112-year sentence is constitutional because his crimes do not "reflect the transient immaturity of youth." 363 Or. at 28, 417 P.3d at 416 (internal quotation marks omitted). The majority arrives at that conclusion based on the testimony at sentencing of petitioner's mental health expert witnesses and majority's inferences from that evidence. Briefly, that testimony was as follows. Petitioner's medical experts, acknowledging that it is difficult to diagnose adolescents, concluded that he suffered from an incurable mental disorder diagnosed as either paranoid schizophrenia or schizoaffective disorder, which combines schizophrenia and depression. For three years prior to his crimes, petitioner had been hearing voices, one of which commanded him to commit the murders and attempted murders. Petitioner's crimes "were directly the product of a psychotic process that had been building intermittently in him over a three-year period"
*419 and would not have occurred without petitioner's mental disorder. Although petitioner's mental disorder could not be cured, the experts testified that petitioner's psychosis was treatable with medication and supervision and that he could be a candidate for release. Without treatment, however, petitioner would "remain dangerous." Finally, an expert testified that he would not want to see petitioner out on the streets without medication and a lot of structure and support services arranged for him. The sentencing court adopted that last view in determining petitioner's sentence.
According to the majority, because petitioner's mental disorder caused his crimes and because his mental disorder is not a transient condition, his crimes reflected not "the transient immaturity of youth" but "reflect[ed] instead a deep-seated psychological problem that will not diminish as petitioner matures " and, thus, his nearly 112-year sentence is constitutional. Id . (internal quotation marks omitted). That conclusion disregards two things. First, the acts of petitioner as a child-offender cannot be extricated from the fact that he is a child. And second, to lawfully impose on a child a sentence of life without the possibility of release, Miller requires more than simply a finding that the youth's condition is not transient; it requires also that the crimes show that the child is "irreparabl[y] corrupt[ ]" or "exhibits **34 such irretrievable depravity that rehabilitation is impossible and life without parole is justified." Montgomery , 136 S.Ct. at 733-34.
First, I cannot agree that petitioner's crimes do not reflect the transient immaturity of youth. In my view, petitioner's youth is inextricable from his crimes, and it is difficult to comprehend how petitioner's youth at the time of his crimes, in combination with his mental disorder, did not affect the nature and gravity of his crimes. Petitioner's crimes were the result of a set of circumstances that were products of both his age and mental disorder. As a matter of fact, one medical expert testified that it is difficult to diagnose adolescents because of that phenomenon. In Roper , the Court expressed that "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." 543 U.S. at 573, 125 S.Ct. 1183. That difficulty, according to the Court, "underlies the rule forbidding psychiatrists from diagnosing any patient under 18 as having antisocial personality disorder, a disorder also referred to as psychopathy or sociopathy, and which is characterized by callousness, cynicism, and contempt for the feelings, rights, and suffering of others." Id. (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 701-06 (4th ed. text rev. 2000)). "If trained psychiatrists with the advantage of clinical testing and observation refrain, despite diagnostic expertise, from assessing any juvenile under 18 as having antisocial personality disorder, we conclude that States should refrain from asking jurors to issue a far graver condemnation[.]" Id.
Petitioner began hearing voices at roughly age 12, three years before his crimes. A child's experience with, and results from, the onset of a mental disorder will almost certainly be different from that of an adult who experiences the onset of the same mental disorder. An adult would more likely be able to understand that something had changed and can better communicate the need for help. A 26-year-old, for example, unlike a 12- to 15-year-old child, who experienced the onset of a mental disorder like petitioner's would have better understood that hearing voices is not simply **35 a common part of life for either himself or the majority of other people. And even if a child could understand the significance of hearing voices, the defining characteristics of youth itself make the distinction between the voices and the child's conscience difficult. An adult would be less likely to have allowed the voices to continue without treatment for three years.
Petitioner's expert testified that his crimes "were directly the product of a psychotic process that had been building intermittently in him over a three-year period." (Emphasis added.) An adult faced with the same slow onset would be less likely than a child to allow the build up to continue until a crisis point that left four people dead and tens *420 more injured or otherwise harmed. Finally, an adult, who has had the benefits of a diagnosis, medication, behavioral treatment, and time to allow for maturity of understanding those things does not have the same danger as an untreated child. For those reasons, I disagree that petitioner's mental disorder was solely, to the exclusion of any role of petitioner's youth, responsible for his crimes.
Second, and relatedly, I disagree with the majority's conclusion that a child may be sentenced to life without the possibility of release based solely on the determination that petitioner's crimes do not "reflect the transient immaturity of youth." As I noted, I believe that the majority's conclusion is based on an incomplete reading of what Miller requires. As summarized by the Supreme Court in Montgomery :
" Miller required that sentencing courts consider a child's diminished culpability and heightened capacity for change before condemning him or her to die in prison. Although Miller did not foreclose a sentencer's ability to impose life without parole on a juvenile, the Court explained that a lifetime in prison is a disproportionate sentence for all but the rarest of children, those whose crimes reflect irreparable corruption."
136 S.Ct. at 726 (internal citations and quotation marks omitted).
Petitioner's crimes do not reflect irreparable corruption and do not exhibit such irretrievable depravity that life in prison without the possibility of release is constitutionally **36 justified. There is no question that petitioner's crimes were horrendous. Any legal conclusion about petitioner or his sentence does not require this, or any, court to diminish or ignore the immense pain, suffering, and loss of life that petitioner inflicted. Petitioner killed four people. He attempted to kill 26 more people. His crimes took place over a period of less than 24 hours. His crimes were the heartbreaking culmination of three years of intermittently building psychosis. His crimes were the product of a 15-year-old boy with a mental disorder. In total, those statements do not demonstrate irreparable corruption. Rather, they demonstrate a brief but horrible psychotic break with horrific consequences.
There is no evidence admitted for the truth of the matter asserted that petitioner's crimes are the result of an irretrievable depravity.[1] There is no evidence that petitioner had engaged in a pattern or series of crimes that would demonstrate that he can never be trusted to be free within the community without causing harm or otherwise committing crimes. The majority assumes that it is implicit in the sentencing court's findings that the number and magnitude of petitioner's crimes reflect a disregard for human life that requires that petitioner serve a 70-month minimum sentence, with 40 months consecutive for each of the 26 persons whom he intended to kill. But that only follows if the petitioner is fully culpable for his crimes. The rarest of children whose crimes reflect irreparable corruption are the cool and calculated souls who appreciate and understand their conditions and who either use the conditions as a means to an end or who revel in the hideousness of their depravity. The rarest of children are not those who struggle with their disorder and fail. Petitioner, as a 12- to 15-year old child, heard voices as a result of his mental disorder for three years prior to his crimes, including one voice that told him to kill. Petitioner's crimes "were directly the product of a psychotic process that had been building intermittently in him over a three-year period" and would not have occurred without petitioner's mental disorder. There is no evidence that petitioner had a disregard for human life before his crimes or **37 that he retained a disregard for human life past the time of his crimes.
Instead, the evidence supports a conclusion that that disregard for human life was a temporary product of petitioner's mental disorder. The conditional statements made by the expert witnesses that petitioner would remain dangerous if he did not accept treatment also mean that petitioner would not be *421 dangerous unless he did not receive treatment for his mental disorder. Therefore, the danger-the risk produced from a disregard for human life-can also be treated. If there is evidence that the condition causing his dangerousness or corruption can be treated, then that corruption is conditional and cannot be considered irreparable. The fear of the danger of petitioner without treatment does not allow for a determination that he is irreparably corrupt when the expert testimony resoundingly supported the idea that petitioner can be safely released under certain circumstances.
The onerous and disproportionately severe sentencing of child offenders with treatable mental illness that manifest in terrible criminal acts tends to drive the public narrative in the wrong direction. When the highest court in the land validates such a sentence, the harm is much greater than the alternative of treatment and release of schizophrenic youths who commit these crimes. That greater harm comes when courts reinforce notions about mental illness in relation to mass shootings that reflect larger cultural stereotypes and public anxieties about matters such as race, ethnicity, social class, and politics.[2] We obscure the issue of race, ethnicity, social class, and politics when we allow mass shootings to represent all gun crime and when we stop using "mental illness" as a medical diagnosis and change it into a sign of gun violence.[3] The facts surrounding this particular mass shooting are well known and irrefutable.
The facts about mental illness are now common knowledge and irrefutable as well. One in five Americans **38 experience some detectable measure of mental illness in a given year; one in 25 American adults experience a serious mental illness in a given year; and one in five American youths ages 13 to 18 experience a severe mental illness.[4] These numbers illustrate the fact that children with severe mental illness mature, and become law abiding adults. The largest share of adults with mental illness live without any limitations in their activities of daily living. Only a small fraction of severely mentally ill youths become severely mentally ill adults. The principles that the Court relied on in Miller cannot allow a conclusion that it is acceptable to imprison for the entirety of their lives any of these youth offenders whose mental illness will likely result in treatable conditions in adulthood without some manifestation of irreparable corruption. In doing so, we buy in to the narrative that the problem is mental illness.
The Court in Miller noted that, given all it said in Roper and Graham , imposition of the harshest penalty possible for a child, life without the possibility of release, will rarely be constitutional because of the great difficulty of determining that a child's crimes reflect irreparable corruption. Miller , 567 U.S. at 479, 132 S.Ct. 2455. That holds true in this case. A conclusion that petitioner's crimes reflect irreparable corruption requires a determination that the danger that petitioner poses to the community will not end or change and cannot be forecast to end or change such that the state is justified in incapacitating him and the threat he poses until his death. Petitioner's crimes reflect a danger that can be reduced and changed-it is neither a certainty nor a constant that the danger petitioner posed at sentencing will not end.
Petitioner's crimes were absolutely horrific. Those crimes were committed by a child with a treatable mental disorder. They do not show irreparable corruption. Both his age and his mental disorder reduce his moral culpability. And both his age and the fact that his mental disorder is treatable weigh against both an explicitly retributive *422 **39 sentence and a sentence aimed at incapacitating him for the rest of his life.
In sum, because I believe that petitioner's crimes are the horrible acts of a juvenile offender whose crimes reflect an unfortunate yet transient immaturity, and because I believe that he is not the rare juvenile offender whose crimes reflect irreparable corruption, I would hold that petitioner's nearly 112-year sentence of incarceration is unconstitutional.
I respectfully dissent.

I acknowledge the majority's reference to previous episodes of violence in petitioner's medical history.

Jonathan M. Metzl & Kenneth T. MacLeish, Mental Illness, Mass Shootings, and the Politics of American Firearms , 105 Am. J. Public Health 240 (2015).

J. Michael Bostwick, A Good Idea Shot Down: Taking Guns Away from the Mentally Ill Won't Eliminate Mass Shootings , 88 Mayo Clin. Proc. 1191 (2013).

National Institute of Health, Transforming the understanding and treatment of mental illnesses (November 2017), https://www.nimh.nih.gov/health/statistics/mental-illness.shtml (accessed May 3, 2018).