IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-841

Filed: 31 December 2020

Davidson County, Nos. 02CRS12155-56

STATE OF NORTH CAROLINA

v.

DARRELL TRISTAN ANDERSON, Defendant.

Appeal by Defendant from judgments entered 20 February 2019 by Judge Joseph N. Crosswhite in Superior Court, Davidson County. Heard in the Court of Appeals 25 August 2020.

> *Attorney General Joshua H. Stein, by Assistant Attorney General Kimberly N. Callahan, for the State.*

> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender Amanda S. Hitchcock, for Defendant.*

DILLON, Judge.

Defendant Darrell Tristan Anderson was sentenced to two consecutive sentences of life without parole ("LWOP") for two murders he committed when he was 17 years old.

Following the General Assembly's enactment of N.C. Gen. Stat. § 15A-1340.19A, *et seq.* to comply with *Miller v. Alabama*, 567 U.S. 460 (2012), Defendant filed a motion for appropriate relief ("MAR") requesting resentencing.

Defendant's motion was granted, and he was resentenced to two consecutive terms of life *with* parole. Based on the statute, under these sentences, Defendant will be eligible for parole after 50 years imprisonment when he is 67 years of age. Defendant appeals.

## I. Argument

On appeal, Defendant contends that this punishment – two consecutive life sentences with parole – amounts to a *de facto* LWOP sentence and is unconstitutional under the Eighth Amendment to the United States Constitution and Article I, Section 27 of the North Carolina Constitution.

This Court recently held an identical sentence unconstitutional on these grounds in *State v. Kelliher*, ___ N.C. App. ___, 849 S.E.2d 333 (2020). However, our Supreme Court has stayed *Kelliher* and granted discretionary review of that decision. Accordingly, *Kelliher* is not binding on our Court.

We hold that the sentences imposed by the trial court, though significant, are not unconstitutional. *Miller v. Alabama* has never held as being unconstitutional a life *with* parole sentence imposed on a defendant who commits a murder when he was 17 years old. Here, Defendant will be eligible for parole in 50 years. Assuming that a *de facto* LWOP sentence (where a defendant is sentenced to consecutive terms for multiple felonies) is unconstitutional, we hold that a 50-year sentence does not equate to a *de facto* life sentence based on the evidence in this case. Our General Statutes

recognize that the life expectancy for a 17-year old is 59.8 years. N.C. Gen. Stat. § 8-46 (2002).

Defendant also argues that the trial court erred by determining it lacked discretion to modify Defendant's sentence to run concurrently, rather than consecutively, as he was originally sentenced. For the reasons explained below, we agree and remand for resentencing.

The trial court stated that it lacked jurisdiction to order the terms to run concurrently. The court did state that it "was not inclined to do so," assuming it did have the jurisdiction. But this statement does not reflect what the trial court would actually do if it was forced to make a decision. People often end up doing things they are not "inclined" to do. It is apparent then that the trial court did not exercise discretion to determine whether a concurrent sentence might be appropriate.

Sections 15A-1340.19A-C, which governed the MAR hearing, described the procedure as a new sentencing hearing. N.C. Gen. Stat. § 15A-1340.19A-C (2019). Section 15A-1340.19B states that the trial court may only sentence the defendant in this context either to LWOP or life with parole. N.C. Gen. Stat. § 15A-1340.19B. However, the Section is silent as to whether the trial court can sentence the defendant to concurrent terms, even though he was sentenced previously to consecutive terms.

Section 15A-1354, though, states that when "multiple sentences of imprisonment are imposed on a person at the same time[,]" the trial court has

discretion to determine whether those sentences are to run consecutively or concurrently. N.C. Gen. Stat. § 15-1354(a). There is nothing in this statute that suggests that it does not apply to a new sentencing hearing under N.C. Gen. Stat. § 15A-1340.19B.

We hold, therefore, that the trial court does have discretion to determine whether multiple sentences are to run concurrently, notwithstanding how the defendant might have been sentenced previously. We, therefore, remand for resentencing on this issue.

## II. Conclusion

For the foregoing reasons, we affirm the portion of the judgment imposing two sentences of life with parole. However, we vacate the portion of the judgment directing that the sentences are to run consecutively. We remand that portion for a new hearing and direct the trial court to exercise discretion to determine whether consecutive or concurrent sentences are appropriate.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

Judge MURPHY concurs.

Chief Judge McGEE dissents by separate opinion.

McGEE, Chief Judge, concurring in part and dissenting in part.

I agree with the majority that N.C. Gen. Stat. §§ 15A-1340.19A, *et seq.* does not prohibit consecutive sentences as a statutory matter based on the reasoning stated in my dissent in *State v. Conner*, No. COA19-1087, ___ N.C. App. ___, ___ S.E.2d ___ (filed December 31, 2020). I also agree with the majority's determination that Defendant must be resentenced. However, because I would hold that consecutive sentences of life with parole constitute a *de facto* life without parole ("LWOP") punishment prohibited by our state and federal constitutions as explained in *State v. Kelliher*, ___ N.C. App. ___, 849 S.E.2d 333, *temp. stay allowed*, ___ N.C. ___, 848 S.E.2d 493 (2020), I respectfully dissent.

## I. FACTUAL AND PROCEDURAL HISTORY

Although I would decide this appeal consistent with *Kelliher*, the individual facts leading to Defendant's convictions, sentencing, and resentencing are unique. Those particular details are recited below to describe Defendant's specific circumstances and provide relevant context absent from the majority.

### A. *Defendant's Early Life*

Defendant was born in 1984 as the youngest of four children. He lived with his brother, two sisters, and both parents, but his father, James Anderson, Sr. ("Mr. Anderson"), did not contribute to raising Defendant. Instead, Defendant's mother and his three siblings took responsibility for Defendant's care. Mr. Anderson was gainfully employed, but the family frequently went without electricity because he did

not pay the utility bills; when the utility company would shut the lights off, Mr. Anderson would steal power by reconnecting it himself.

Mr. Anderson regularly smoked crack cocaine at home and would choke his children; Mr. Anderson first physically abused Defendant in this manner at age five. He also encouraged Defendant to drink often by supplying him with alcohol as early as age seven. His abuse further included sexually molesting Defendant's two sisters when they were as young as age six. In 2008, Mr. Anderson was convicted of sexually abusing a child outside the nuclear family.

Defendant was ill-behaved early on and frequently fought with his older brother; he was eventually diagnosed with ADHD and prescribed Ritalin. At around ten years old, Defendant started living part-time with his older sister, who had since moved into her own house. She tried to be a positive influence on her younger brother and was apparently successful; Defendant never got into trouble while living there, was able to control his ADHD with Ritalin, and told his sister that he wanted to grow up, have a family, and be a writer. He was also succeeding in school, and his teachers spoke well of him to his sister.

Defendant had few other good role models. When Defendant was eleven, his older brother participated in a robbery and murder. Defendant's older cousin, Eddie Neely, was his only friend, and the two would spend time together at Defendant's parents' house. Mr. Neely used and dealt cocaine, and, according to Defendant's

sister, would "tell [Defendant] to do all his bad things. . . . Eddie was just using [Defendant] to do his dirty work."

Defendant's behavior and family life declined when he stayed at his parents' house and outside the presence of his sister. He began to use marijuana at age 13 and was smoking marijuana and drinking alcohol on a daily basis by the following year. This drug use—which sometimes involved Mr. Neely—would extend to powdered cocaine and ecstasy later. His father grew increasingly physically abusive as Defendant aged, on one occasion going so far as to attack Defendant with an axe. When Defendant turned 17, he began smoking crack cocaine with his father. Defendant dropped out of school that same year.

## B. The Robbery and Murders

Defendant and Mr. Neely were spending time together on the night of 3 December 2002 when they decided to sell crack cocaine to an acquaintance, Myra Hedgepeth. The two arrived at Ms. Hedgepeth's home to find her with her boyfriend, Edward Baird, and two other men. The group smoked crack cocaine and drank beer together before Defendant, Mr. Neely, and one of the other men at the house left to drink liquor elsewhere.

Around 10:00 p.m., and after he and Defendant had returned to Defendant's home, Mr. Neely told Defendant he wanted more crack cocaine. They considered robbing a convenience store for drug money but ultimately decided to rob Ms.

Hedgepeth instead. Defendant took a shotgun from his closet and the two walked back to Ms. Hedgepeth's house to carry out the crime.

Ms. Hedgepeth was not at the home when Defendant and Mr. Neely arrived. They were greeted instead by Mr. Baird, who Defendant took hostage in the living room while Mr. Neely went to find Ms. Hedgepeth. Mr. Neely located her and brought her back to the house; once inside, Mr. Neely subdued the couple while Defendant searched Ms. Hedgepeth's belongings for cash.

Defendant's search came up empty. He asked Ms. Hedgepeth where her money was, and she replied that she did not have any. Moments later, Defendant shot Mr. Baird in the head.

Ms. Hedgepeth attempted to flee, pushing Defendant towards Mr. Neely while she ran for the door. Defendant managed to grab her and a struggle ensued. The shotgun fired again during the course of the fight, striking Mr. Neely in the hand. Ms. Hedgepeth eventually made it out of the house in the confusion. Defendant and Mr. Neely ran outside after her, where they found her lying in the front yard screaming. Defendant shot and killed her, and the two fled the scene in Ms. Hedgepeth's car.

Defendant and Mr. Neely were arrested in connection with the murders, each telling the police that the other shot and killed Mr. Baird and Ms. Hedgepeth. Defendant later revised his earlier statements and confessed to killing both victims.

### C. *Defendant's Plea, Sentencing, and Resentencing*

Defendant was indicted on two counts each of first-degree murder and robbery with a dangerous weapon in December of 2002. The State filed a notice of intent to seek the death penalty the following January, and a grand jury issued superseding indictments for two counts of first-degree murder with aggravating circumstances a month later. Defendant subsequently pled guilty to the murder charges in exchange for dismissal of the robbery counts and two sentences of life without parole. The trial court entered judgments consistent with the plea in August of 2003.

After the General Assembly enacted N.C. Gen. Stat. §§ 15A-1340.19A, *et seq.* in an effort to comply with *Miller*, Defendant filed an MAR on 26 June 2013 requesting a new sentencing hearing. The trial court granted Defendant's motion in an order entered a week later.

By 2018, Defendant had not yet received a resentencing hearing. His counsel filed a motion challenging the constitutionality of both LWOP sentences and N.C. Gen. Stat. § 15A-1340.19A that November, which was heard at his resentencing hearing on 20 February 2019. At resentencing, and after the State recited the facts of Defendant's crimes, Defendant offered evidence in mitigation through the testimony of Defendant's sister. In addition to recounting Defendant's upbringing, she described how Defendant had changed in prison:

> Well, since he's been incarcerated, he . . . wrote a 500-page
> book and then he wrote maybe about four or five little small
> books that I'm trying to get published.
>
> . . . .
>
> The stories [are] about young teens getting in trouble.
>
> . . . .
>
> [H]e's trying to encourage teens and abus[ed] children[] not
> to follow no one's steps, for one. And listen to people getting
> in trouble. Change [their] [lives] around[.]

His sister further testified that Defendant had attained his GED and job training in upholstery while incarcerated.

Defendant also offered documentary evidence in mitigation. This included several of his short stories and a report from the Department of Correction disclosing Defendant's full scale I.Q. of 65, reflecting a "notable life deficit" in learning. Defendant's presentation concluded with an allocution in which he expressed regret for his crimes and detailed how his troubled upbringing and drug abuse substantially diminished his mental and moral development. He further explained his desire to help children learn from his mistakes, but was concerned that consecutive sentences of life with parole would "hinder [his] success and prevent [him] from reaching the children and being successful at [his] desire and [his] dreams and dedicating something to society." The trial court responded to the allocution by saying, "I've been doing this job for eleven years and that's one of the most powerful things I've

ever heard anybody say. . . . So I want to thank you for saying that. I just want to acknowledge that. So thank you very much for saying that." The judge then asked Defendant if he had another copy of his written allocution so the court could mark it as an exhibit and place it in the file.

In closing arguments, Defendant's counsel asked the trial court to sentence Defendant to concurrent sentences of life with parole, as the alternative presented, "under the auspices of the Eighth Amendment, . . . a de facto life without parole [sentence]." The prosecutor responded by first acknowledging that "it was my opinion that [Defendant's] apology was sincere and that his remorse was genuine." He then "concede[d] that the defendant has presented evidence from which the Court could find . . . [facts in] mitigation" under N.C Gen. Stat § 15A-1340.19B(c). The State also stated that it would "trust the Court to weigh whether a sentence of life with or without parole is appropriate in light of that mitigating evidence." As for whether Defendant's sentences should run concurrently or consecutively, the State argued that the former would be contrary to his plea agreement, and that: (1) such a sentence was procedurally barred by denial of a prior MAR in which Defendant argued his plea was not freely and voluntarily made; (2) the trial court lacked jurisdiction to enter concurrent sentences because Defendant's MARs did not "provide a factual and legal basis for that relief[;]" (3) Defendant's evidence at resentencing did not support a

conclusion that his plea was involuntarily given; and (4) the facts of Defendant's crimes support a discretionary imposition of consecutive sentences.

The trial court announced its sentencing decision from the bench, ordering that Defendant be sentenced to life with parole on both counts. It denied Defendant's motion and request for concurrent sentences, concluding that it lacked jurisdiction and, even if it did have jurisdiction, would not run the sentences concurrently in its discretion. Defendant gave oral notice of appeal, and the trial court entered written orders and judgments consistent with its oral ruling following the hearing.

## II. **ANALYSIS**

Defendant's sentences, which place parole eligibility at age 67 after 50 years imprisonment, are identical to the sentences this Court held unconstitutional in *Kelliher* following consideration of *Roper v. Simmons*, 543 U.S. 551, 161 L. Ed. 2d 1 (2005), *Graham v. Florida*, 560 U.S. 48, 176 L. Ed. 2d 825 (2010), *Miller v. Alabama*, 567 U.S. 460, 183 L. Ed. 2d 407 (2012), and *Montgomery v. Louisiana*, ___ U.S. ___, 193 L. Ed. 2d 599 (2016). As we held in that case:

> (1) *de facto* LWOP sentences imposed on juveniles may run afoul of the Eighth Amendment; (2) such punishments may arise out of aggregated sentences; and (3) a sentence that provides no opportunity for release for 50 or more years is cognizable as a *de facto* LWOP sentence. Consistent with the Eighth Amendment as interpreted by *Roper*, *Graham*, *Miller*, and *Montgomery*, these holdings compel us to reverse and remand Defendant's sentence. Under different circumstances, we would leave resentencing to the sound discretion of the trial court. Here, however, we hold that of

> the two binary options available—consecutive or concurrent sentences of life with parole—one is unconstitutional. We therefore instruct the trial court on remand to enter two concurrent sentences of life with parole as the only constitutionally permissible sentence available under the facts presented.

*Kelliher*, ___ N.C. App. at ___, 849 S.E.2d at 352 (citation omitted). That decision's reasoning applies with equal force to this case, and I would hold that the same relief should be granted here.

The majority, as in *Conner*, declines to apply *Kelliher*'s reasoning because: (1) "*Miller* has never held as being unconstitutional a life with parole sentence imposed on a defendant who commits a murder when he was 17 years old[;]" and (2) the life expectancy and mortality table found in N.C. Gen. Stat. § 8-46 (2019) lists a 17-year old's life expectancy as 59.8 years. In making its first point, the majority does not address the numerous decisions from state appellate courts—expressly relied upon in *Kelliher*—that have held *Miller* does apply to juveniles convicted of homicides and sentenced to terms of imprisonment that are the functional equivalent of a LWOP punishment. *See, Kelliher*, ___ N.C. App. at ___ n 11, 849 S.E.2d at 345 n 11 (citing 17 states whose appellate courts have recognized lengthy term-of-years sentences as *de facto* LWOP sentences subject to the constitutional protections of *Roper, Graham*, and/or *Miller*, including eleven decisions with holdings that directly applied those protections to a juveniles convicted of homicide or would apply them to such cases).

To the extent the statutory mortality table found in N.C. Gen. Stat. § 8-46, which was not relied upon by the State at resentencing or on appeal, applies to the constitutional question before this Court, that statute by its very terms provides that it "*shall* be received . . . *with other evidence as to the health, constitution and habits of the person*[.]" (emphasis added). Thus, the life expectancy "table . . . is not conclusive, but only evidentiary," *Young v. E. A. Wood & Co.*, 196 N.C. 435, ___, 146 S.E.2d 70, 72 (1929) (construing a predecessor statute), and "life expectancy is determined from evidence of the plaintiff's health, constitution, habits, and the like, *as well as* from [the statutory] mortuary tables." *Wooten v. Warren by Gilmer*, 117 N.C. App. 350, 259, 451 S.E.2d 342, 359 (emphasis added) (citation omitted). The 59.8 year life expectancy for 17-year-old minors found in the statute cannot be said to be conclusive in light of Defendant's "health, constitution, habits, and the like." *Id.* For example—and setting aside any impact that a minimum of 50 years of imprisonment will have on Defendant—it is uncontroverted that Defendant has a years-long history of heavy and varied drug abuse dating back to at least age seven that could bear upon longevity.

In sum, though I agree with the majority that Defendant should be resentenced, the majority does not convince me that *Kelliher*'s analysis is inapplicable to the present case. I would reverse Defendant's sentence and remand with the instruction to resentence him to concurrent terms of life with parole. *See Kelliher*,

___ N.C. App. at ___, 849 S.E.2d at 352.  For these reasons, I respectfully dissent from the majority's holding to the contrary.