FILED

09/19/2025

Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT JACKSON

July 9, 2025 Session

## DONAVAN DANIEL v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Weakley County**
No. 2003-CR-34      Jeff Parham, Judge

_____

### No. W2025-00039-CCA-R3-PC

_____

The Petitioner, Donavan Daniel, was convicted in the Weakley County Circuit Court of three counts of first degree felony murder, one count of first degree premeditated murder, one count of especially aggravated robbery, and one count of possession of marijuana with intent to sell or deliver. After a bifurcated sentencing hearing, the jury sentenced him to life without parole for two counts of first degree felony murder, life for the remaining count of first degree felony murder, and life for first degree premeditated murder. This court affirmed the convictions on direct appeal and affirmed the denial of post-conviction relief. Subsequently, the Petitioner filed a motion to reopen his post-conviction petition. After a hearing, the post-conviction court granted the motion to reopen, granted post-conviction relief, and reduced the Petitioner's two sentences of life without parole to life. On appeal, the State contends that the post-conviction court erred in applying *State v. Booker*, 656 S.W.3d 49 (Tenn. 2022), to the Petitioner's sentences of life without parole and, therefore, erred in reducing the Petitioner's sentences to life. We agree with the State. Accordingly, the judgment of the post-conviction court is reversed, and the Petitioner's sentences of life without parole for first degree felony murder in counts three and four are reinstated.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and MATTHEW J. WILSON, JJ., joined.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; and Meghan Fowler, District Attorney General Pro Tem, for the appellant, State of Tennessee.

Melinda Meador, Martin, Tennessee, for the appellant, Donavan Daniel.

Amy R. Mohan, Nashville, Tennessee, and Marsha L. Levick, Andrew K. Yeats, and Hannah Stommel, Philadelphia, Pennsylvania, for the Amicus Curiae, Juvenile Law Center and Campaign for the Fair Sentencing of Youth.

Jonathan Harwell, Nashville, Tennessee for the Amicus Curiae, Tennessee Association of Criminal Defense Lawyers.

## FACTS

Just days before his eighteenth birthday, the Petitioner shot and killed Clarence Jones and Mr. Jones' roommate, Cassandra Tamakia Thomas. The juvenile court transferred the case to circuit court, and the Weakley County Grand Jury returned a six-count indictment, charging the Petitioner with first degree premeditated murder of Mr. Jones in count one, first degree felony murder of Mr. Jones in perpetration of robbery in count two, first degree felony murder of Ms. Thomas in perpetration of first degree murder of Mr. Jones in count three, first degree felony murder of Ms. Thomas in perpetration of robbery in count four, especially aggravated robbery of Mr. Jones in count five, and possession of a controlled substance with intent to sell or deliver in count six. *State v. Daniel*, No. W2000-00981-CCA-R3-CD, 2001 WL 1690196, at *1 (Tenn. Crim. App. Dec. 28, 2001), *perm. app. denied* (Tenn. June 3, 2002). The State gave notice of its intent to seek sentences of life without parole, and the Petitioner filed an ex parte motion requesting the services of a mitigation expert. *Id*. The trial court held an ex parte hearing on the Petitioner's motion for an expert and denied the motion, concluding that there was no authority for expert services for indigent defendants in non-capital cases. *Id*. at *9.

The Petitioner went to trial in February 2000. According to the proof at trial, the Petitioner gave statements to the police in which he provided the following sequence of events: The Petitioner and Mr. Jones smoked marijuana and consumed alcohol in Mr. Jones' home on the afternoon of June 2, 1999. *Id*. at *2. People were coming and going from the home, and some of them bought marijuana from Mr. Jones. *See id*. When Ms. Thomas came home, Mr. Jones "rolled" another marijuana cigarette and went to his bedroom. *Id*. The Petitioner went to the kitchen, picked up Mr. Jones' rifle from the counter, and went into the hallway leading to Mr. Jones' room. *Id*. The Petitioner shot Mr. Jones while Mr. Jones was standing in his bedroom. *Id*. Mr. Jones did not see the Petitioner before the shooting. *Id*. The Petitioner then turned around and shot Ms. Thomas, who was standing just inside the hallway bathroom. *Id*. After the killings, the Petitioner took money from Mr. Jones' pocket and dresser. *Id*. at *3. He also took a ring and a Rolex watch off Mr. Jones. *Id*. The Petitioner fled in Mr. Jones' car and took the murder weapon and a large bag of marijuana with him. *Id*. The next day, the Petitioner "'went on about [his] day like nothing had happened.'" *Id*. A forensic pathologist testified that both victims

were shot one time in the head and that the shooter was one-half foot to two feet from Ms. Thomas at the time of the shooting. *Id*. at *5.

A jury convicted the Petitioner of all six counts as charged in the indictment. *Id*. at *1. In a bifurcated sentencing hearing, the jury found two aggravating circumstances and sentenced him to life for the first degree murders of Mr. Jones in counts one and two and to life without parole for the first degree murders of Ms. Thomas in counts three and four. *Id*. at *2. The trial court merged the convictions in counts one and two and merged the convictions in counts three and four and sentenced the Petitioner to twenty years for especially aggravated robbery in count five and to one year for possession of marijuana with intent to sell or deliver in count six. *Id*. The Petitioner was to serve all of the sentences concurrently. *Id*.

On direct appeal of his convictions to this court, the Petitioner claimed that (1) the trial court erred by denying his motion to suppress his incriminating statements to police during custodial interrogations, (2) the trial court erred by refusing to appoint a mitigation expert for the defense, and (3) the evidence was insufficient to support his convictions of first degree murder. *Id*. Regarding the second issue, the Petitioner asserted that a mitigation expert was necessary because the State was seeking life without parole and, therefore, the jury needed to consider aggravating and mitigating factors. *Id*. at *9. This court concluded that the trial court erred in finding that there was no authority to grant the Petitioner's motion for expert services in a non-capital case. *Id*. at *10. Nevertheless, this court concluded that the trial court did not err in denying the Petitioner's request for a state-funded expert because the Petitioner did not demonstrate a particularized need for the services of a mitigation expert in a late-filed affidavit prepared by the defense's proposed expert. *Id*. This court affirmed the Petitioner's convictions. *Id*. at *15.

The Petitioner filed a timely petition for post-conviction relief in which he alleged that he received the ineffective assistance of trial counsel. *Daniel v. State*, No. W2003-02511-CCA-R3-PC, 2004 WL 2159004, at *1 (Tenn. Crim. App. Sept. 27, 2004), *perm. app. denied* (Tenn. Jan. 24, 2005). One of the Petitioner's grounds for ineffective assistance was trial counsel's failure to demonstrate a particularized need for expert services and trial counsel's failure to present the affidavit of the defense's proposed mitigation expert to the trial court in a timely manner. Relevant to this appeal, trial counsel testified at the post-conviction evidentiary hearing as follows:

> Petitioner's counsel said that he contacted Dr. Frank Einstein as a potential expert witness on December 2, 1999. Counsel believed that he discussed his own personal observations about [Petitioner] and his background with Dr. Einstein and sent Dr. Einstein a copy of the mental evaluation performed by the West Tennessee Mental Health Institute. Dr.

Einstein provided an affidavit outlining his qualifications, the scope of his services, and his fees. Dr. Einstein stated in the affidavit that one of the goals of his engagement would be to identify any mitigating factors that could be presented to the jury during Petitioner's sentencing hearing. Dr. Einstein's affidavit, however, was not filed with the court until September 6, 2000.

Counsel admitted that he did not have Dr. Einstein's affidavit at the time the ex parte hearing on Petitioner's motion for expert services was held. He stated that he had tried to identify a particularized need for Dr. Einstein's services prior to the ex parte hearing but was unable to do so. Instead, counsel told the trial court that Dr. Einstein's services were necessary to make sure that he did not miss anything that might be useful as a mitigating factor during sentencing. In any event, counsel explained that Dr. Einstein's affidavit did not address the issue of a particularized need.

*Id*. at *4. The post-conviction court denied relief, and this court affirmed the judgment of the post-conviction court, explaining:

Petitioner did not offer any evidence at the post-conviction hearing in support of a particularized need for an expert witness, other than Dr. Einstein's affidavit. This Court has already concluded on [direct appeal of the Petitioner's convictions] that Dr. Einstein's affidavit does not support Petitioner's particularized need for an expert witness under the [requirements of *State v. Barnett*, 909 S.W.2d 423 (Tenn. 1995)]. *Daniel*, 2001 WL 16901096, at *11. Petitioner, therefore, failed to set forth any proof of prejudice assuming his counsel had rendered ineffective assistance with regard to his request for an expert. Petitioner is not entitled to relief on this issue. *Id*.

*Id*. at *7.

In 2005, the Petitioner filed a federal habeas corpus petition in which he raised multiple grounds of ineffective assistance of trial counsel, including counsel's failure to obtain a mitigation expert at sentencing and counsel's failure to provide the proposed mitigation expert's affidavit to the trial court in order to make the required showing of a particularized need for expert services. *Daniel v. Parker*, No. 05-2273-JPM/dkv, 2008 WL 3834043, at *4 (W.D. Tenn. Aug. 13, 2008). The district court concluded that the Petitioner failed to articulate a particularized need for expert services in his petition and that he was ignoring the finding by the state courts that the proposed expert's affidavit did not support a particularized need under the *Barnett* requirements. *Id*. at *16.

- 4 -

In 2015, the Petitioner filed an additional federal habeas corpus petition, claiming that (1) his sentences of life without parole for crimes committed as a juvenile violated the Eighth Amendment; (2) the trial court infringed on his Eighth Amendment rights by not instructing the jury to weigh mitigating factors during sentencing; and (3) he was denied the effective assistance of counsel because trial counsel conceded guilt in opening statements and failed to object to comments by prospective jurors. *Daniel v. Phillips*, No. 1:18-cv-01187-JDB-jay, 2021 WL 1794767, at *1 (W.D. Tenn. May 5, 2021). Regarding his second claim, the Petitioner contended that his sentences of life without parole were unconstitutional under *Miller v. Alabama*, 567 U.S. 460 (2012). Considering the first and second claims together, the district court concluded that they were barred by the statute of limitations. *Id*. at *5.

On October 26, 2023, the Petitioner filed a motion to reopen his post-conviction petition, claiming that *State v. Booker*, 656 S.W.3d 49 (Tenn. 2022), established a constitutional right that was not recognized as existing at the time of the trial and that was applicable to his case. Specifically, the Petitioner asserted that under *Booker*, trial counsel should have presented mitigating evidence for the jury to consider at sentencing related to his age at the time of the crimes such as his lack of maturity, impulsivity, recklessness, and vulnerability to negative influences and peer pressure. In support of his claim, the Petitioner attached excerpts from his sentencing hearing transcript to his motion to reopen.

The excerpts showed that four witnesses testified for the Petitioner at sentencing. First, Jennifer Martin testified that she was a guidance counselor at Martin Westview, the high school the Petitioner attended as a freshman. The Petitioner transferred to another high school at the beginning of his sophomore year but returned to Martin Westview for one month as a junior. Ms. Martin worked with him when he was a student at Martin Westview. She said his school records for kindergarten through fifth grade showed that he received "satisfactory grades and B's" and that he was promoted to the next grade every year. The Petitioner "maintained C averages" in sixth and seventh grade and had a "low C" average in eighth grade. In ninth grade, the Petitioner had "C averages" in his classes but failed one course. Ms. Martin acknowledged that the Petitioner's grades declined in eighth and ninth grade. She said that he was very polite and that she considered him respectful. The Petitioner was not a discipline problem but "had some detentions, which are after-school sessions for tardies, chewing gum, and just the normal things that many high school students would have."

Kathy Vincent testified that she owned and managed a family daycare business in her home and that she had known the Petitioner since he was four years old. She described him as "a loving child" and said that he was "always full of fun, always laughing, cheerful." He played well with other children and was very respectful of adults. The Petitioner attended McCade United Methodist Church, the same church Ms. Vincent attended. The

Petitioner went to church with Ms. Vincent or on his own. She said that as he aged, he "kinda branched away" from her. When she would see him, though, he "still had that same love for [her]."

Ms. Vincent testified that the Petitioner obtained his GED and was planning to attend the University of Tennessee at Martin when the shootings occurred. She said she "couldn't believe it" when she heard about the crimes. Ms. Vincent stated that she saw the Petitioner one or two weeks before the shootings and that he was "just his same old self." She then described an incident involving Ms. Thomas and the Petitioner: Ms. Vincent ordered food in the drive-through line at a KFC restaurant. Ms. Vincent's granddaughter and the Petitioner were sitting in the back seat of Ms. Vincent's car. Ms. Thomas was working the drive-through window, saw the Petitioner, and asked the Petitioner how he was doing. The Petitioner told Ms. Thomas that he was "'just laying cool'" and "'not trying to find trouble and don't want trouble finding me.'" Ms. Thomas told the Petitioner to stay out of trouble, and he responded, "'I'm staying as far away from trouble as I can.'"

Ms. Vincent testified that the Petitioner "slipped over the wrong way, maybe" but reiterated that he was "a good child." She said the Petitioner still had something to offer society by helping others stay away from trouble.

On cross-examination, Ms. Vincent acknowledged that Ms. Thomas expressed concern about the Petitioner in the drive-through line. She also acknowledged that Ms. Thomas "was going out of her way to be nice to him."

Reverend Joe Beale testified that he had been the Pastor of McCade United Methodist Church since 1984 and that the Petitioner began attending the church and participating in the church's children's program when the Petitioner was eight or nine years old. The Petitioner was "one of the stars" of the Christmas and Easter programs because he could recite long stanzas of text. Reverend Beale described the Petitioner as "a very, very intelligent young man" and "very well-mannered." In the past few years, the Petitioner did not attend church as often. One or two months before the shooting, Reverend Beale saw the Petitioner in church and told him to stay out of trouble. After the shooting, Reverend Beale visited the Petitioner in jail and received telephone calls and letters from the Petitioner. The Petitioner expressed remorse and wrote a letter to the church. In the letter, the Petitioner told youth to obey their parents and "do right." Reverend Beale said he read the letter to the young men in his congregation.

On cross-examination, Reverend Beale acknowledged that the Petitioner had "a lot of potential" as a young man but that the Petitioner "fell into the wrong crowd." Reverend Beale said that he did not know the victims but that his "heart goes out" to their families.

Vivian Owens, the Petitioner's mother, testified that the Petitioner was born on June 8, 1981, in Blytheville, Arkansas. She said that he was "too good to be true" as a child, that he was happy as a toddler, and that he was "just a really good kid." The Petitioner lived with his father in Blytheville for seven months in the tenth grade but had no other contact with his father. Ms. Owens said that the Petitioner got along with everyone and obeyed her. He received average grades until the seventh grade, and studying became less of a priority for him as he got older. When the Petitioner was fifteen years old, he went to a facility for drug and alcohol treatment. The Petitioner ended up receiving treatment at seven facilities for drugs, alcohol, and behavior problems. The Petitioner became more difficult to control because his friends were adults. Ms. Owens said the Petitioner's adult friends were "a big issue" for her.

Ms. Owens testified that at the time of the shootings, the Petitioner "had shied away from a lot of the people that he used to hang out with" and that his family "had really high hopes that maybe he had made a break from some of these people." She said that the Petitioner had an IQ of 136 and that he had always been intelligent. She said he still had something to offer society, even if he was not released from confinement until he was seventy years old, because he could "show other juveniles that they don't have to go through this."

On cross-examination, Ms. Owens acknowledged that the Petitioner associated with some "pretty unsavory characters." When he was released from his most recent treatment facility, Ms. Owens hoped that he had turned his life around. She acknowledged, though, that he did not.

The post-conviction court issued an order appointing counsel and finding that the Petitioner's motion to reopen stated a colorable claim that was based on "a new rule of constitutional law not available to him previously." Post-conviction counsel filed an amended petition, acknowledging that the trial court held a sentencing hearing prior to the jury's imposing sentences of life and life without parole. However, post-conviction counsel claimed in the amended petition that the Petitioner's sentences violated *Booker* because the Petitioner's age at the time of the crimes was never mentioned at sentencing; the defense did not present any mitigating evidence to show how the Petitioner's youth, immaturity, or lack of character development might have led him to shoot the victims; the trial court did not instruct the jurors on the information necessary for them to evaluate how the Petitioner's youth affected his commission of the offenses; and the jury did not have any discretion to consider or impose a sentence less than imprisonment for life. The State filed a written response to the amended petition, asserting that *Booker* did not apply because *Booker* was limited to cases in which the juvenile offender received a life sentence without being afforded a sentencing hearing.

On November 14, 2024, the post-conviction court held a hearing to determine the applicability of *Booker* to the Petitioner's case. During the hearing, the State argued that the holding in *Booker* was "extremely narrow" in that it only applied to juveniles who received automatic life sentences and did not apply to defendants who had "the opportunity" to present proof of youth at sentencing. In support of its argument, the State noted that our supreme court in *Booker* crafted a remedy for defendants automatically sentenced to life but did not craft a remedy for defendants sentenced to life without parole. Post-conviction counsel responded that *Booker* stood for the proposition that a juvenile defendant facing a sentence of life without parole or life was entitled to "meaningful" sentencing.

In its oral ruling at the hearing, the post-conviction court concluded that the original post-conviction court incorrectly determined that the Petitioner did not receive the effective assistance of trial counsel. The post-conviction court found that trial counsel was in fact ineffective for failing to present the proposed mitigation expert's affidavit to the trial court to demonstrate a particularized need for expert services. The post-conviction court then found it "troubling" that *Booker* applied to mandatory life sentences but not to harsher sentences of life without parole. The post-conviction court concluded that *Booker* applied in this case and that the jury should have heard expert testimony at sentencing regarding the Petitioner's youth.

On December 20, 2024, the post-conviction court entered a written order, reiterating its oral findings that the Petitioner received sentences of life without parole "in part" because trial counsel was ineffective and that the jury should have heard expert testimony at sentencing to explain how the Petitioner's age affected his judgment. The post-conviction court found that *Booker* applied and ordered that the Petitioner's sentences for first degree murder remain at sixty years but that he receive an individualized parole hearing pursuant to the remedy in *Booker*, effectively reducing the Petitioner's sentences of life without parole to life. The State filed a timely notice of appeal.

## ANALYSIS

The State contends that the post-conviction court erred in reducing the Petitioner's sentence of life without parole to life because *Booker* only applies to juvenile homicide offenders serving automatic life sentences. The Petitioner argues that the post-conviction court correctly determined that *Booker* applies here because he did not receive a sentencing hearing that allowed the jury to consider evidence regarding the mitigating qualities of his youth, such as expert testimony about how his youthfulness factored into his commission of the offenses. We agree with the State that the trial court erred.

"Relief under [the Post-Conviction Procedure Act] shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The Act contemplates the filing of only one petition for post-conviction relief and provides for the summary dismissal of a subsequent petition if a previous petition has been filed and resolved on the merits. Tenn. Code Ann. § 40-30-102(c). However, there are limited circumstances in which a petitioner may allege later arising claims via a motion "to reopen the first post-conviction petition." Tenn. Code Ann. § 40-30-117(a). Relevant to this case, a motion to reopen a first post-conviction petition should be granted when "[t]he claim in the motion is based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, if retrospective application of that right is required." *Id*. at § 40-30-117(a)(1). We review a post-conviction court's granting of a motion to reopen a post-conviction petition de novo. *Anderson v. State*, 692 S.W.3d 94, 103 (Tenn. Crim. App. 2023).

The possible punishments for first degree murder are death, imprisonment for life without possibility of parole, or imprisonment for life. Tenn. Code Ann. at § 39-13-202(c)(1). The State must file written notice that it intends to seek death or life without parole. *Id*. at § 39-13-208(a), (b). In a first degree murder case where the State does not seek death but seeks life without parole, and a jury convicts the defendant of first degree murder, then "the jury shall fix the punishment in a separate sentencing proceeding, to determine whether the defendant shall be sentenced to imprisonment for life without possibility of parole or imprisonment for life." *Id*. at § 39-13-207(a)(1). If the State does not seek life without parole, a defendant convicted of first degree murder receives a mandatory life sentence. *Id*. at § 39-13-208(c). A life sentence is a determinate sentence of sixty years, which may be reduced by fifteen percent, or nine years, for certain statutorily authorized sentence reduction credits. *Id*. at § 40-35-501(h)(2)(A).

In *Miller v. Alabama*, 567 U.S. 460, 470 (2012), the United States Supreme Court held that mandatory sentences of life without parole for juvenile offenders violate the Eighth Amendment's prohibition against cruel and unusual punishment. The Court did not hold in *Miller*, though, that a juvenile offender could never be sentenced to life without parole. Instead, *Miller* prescribed that "[a] hearing where 'youth and its attendant characteristics' are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not." *Montgomery v. Louisiana*, 577 U.S. 190, 210 (2016) (quoting *Miller*, 567 U.S. at 483). "[A] judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." *Miller*, 567 U.S. at 489. The Court later held in *Montgomery* that *Miller*'s ban on mandatory sentences of life without parole for juvenile offenders announced a new substantive rule that had to be applied retroactively. 577 U.S. at 212. Since *Miller*, this court has upheld judge and jury sentences of life without parole

- 9 -

for juvenile homicide offenders who received individualized sentencing hearings. *Lee v. Phillips*, No. W2019-01634-CCA-R3-HC, 2020 WL 4745484, at *5 (Tenn. Crim. App. Aug. 14, 2020), *no perm. app. filed*; *Brown v. State*, No. W2015-00887-CCA-R3-PC, 2016 WL 1562981, at *7 (Tenn. Crim. App. Apr. 15, 2016), *perm. app. denied* (Tenn. Aug. 19, 2016); *Dickerson v. State*, No. W2013-01766-CCA-R3-PC, 2014 WL 3744454, at *5 (Tenn. Crim. App. July 28, 2014), *perm. app. denied* (Tenn. Nov. 19, 2014); *see State v. Gutierrez*, No. M2015-01235-CCA-R3-CD, 2017 WL 2274644, at *15 (Tenn. Crim. App. May 24, 2017) (sentence of life plus sixteen years, tantamount to a sentence of life without parole, did not violate *Miller* when trial court considered defendant's youth at the time of the crimes), *perm. app. denied* (Tenn. Sept. 21, 2017). Likewise, the United States Supreme Court has affirmed a sentence of life without parole for a juvenile offender when the defendant received a sentencing hearing and the trial court had discretion to impose a lesser sentence in light of the defendant's youth. *Jones v. Mississippi*, 593 U.S. 98, 120-21 (2021).

In *Booker*, the defendant, who was sixteen years old at the time of the crimes, was convicted of first degree felony murder and especially aggravated robbery. 656 S.W.3d at 52. Pursuant to statute, the trial court imposed an automatic life sentence for the first degree murder conviction. *Id.* On appeal to our supreme court, the only issue the court addressed was the constitutionality of Tennessee's mandatory life sentence imposed on a juvenile homicide offender. In a plurality opinion, the court held that "an automatic life sentence when imposed on a juvenile homicide offender with no consideration of the juvenile's age or other circumstances violates the prohibition against cruel and unusual punishment under the Eighth Amendment to the United States Constitution." *Id.* As the *Booker* court explained, rather than imposing an automatic life sentence, a trial court "must have discretion to impose a lesser sentence after considering the juvenile's age and other circumstances." *Id.* The remedy created by the court did not grant Mr. Booker a new sentencing hearing but granted him "an individualized parole hearing where his age and other circumstances" could be properly considered, with the timing of the hearing based on his parole eligibility in the unrepealed version of Tennessee Code Annotated section 40-35-501(h)(1), addressing release eligibility status for a defendant receiving a sentence of life imprisonment, that was previously in effect. *Id.* at 53.

The holding in *Booker* made it clear that our supreme court's ruling applies only to juvenile offenders receiving automatic life sentences. 656 S.W.3d at 66 (stating that "we hold that Tennessee's automatic life sentence with a minimum of fifty-one years when imposed on juveniles violates the Eighth Amendment"); *see id.* at 69 (Kirby, J., concurring in the judgment) ("I concur in the holding in the plurality opinion that Tennessee Code Annotated section 40-35-501(h)(2), when imposed on a juvenile homicide offender, violates the prohibition against cruel and unusual punishment in the Eighth Amendment to the United States Constitution."). As the court explained in *Booker*, "[I]n juvenile first-

degree murder cases, and only in these cases, a sentence is automatically imposed without considering age, the nature of the crime, or any other factors. . . . Tennessee's automatic life sentence when imposed on juvenile offenders lacks the necessary procedural protection to guard against disproportionate sentencing." *Id*. at 63.

Moreover, as noted by the State, this court has already concluded that *Booker* does not apply in a case similar to the Petitioner's case. In *Brown v. State*, a jury convicted the sixteen-year-old petitioner of two counts of first degree murder and one count of especially aggravated burglary for the deaths of an elderly couple. No. W2015-00887-CCA-R3-PC, 2016 WL 1562981, at *1 (Tenn. Crim. App. Apr. 15, 2016), *perm. app. denied* (Tenn. Aug. 19, 2016). After a sentencing hearing, the jury sentenced him to life without parole for the murder convictions, and the trial court ordered that he serve the sentences consecutively. *Id*. On post-conviction, the petitioner argued that his consecutive sentences of life without parole violated *Miller*. *Id*. at *5. This court disagreed, stating:

> [T]he petitioner's sentence of life without parole was not mandatory and was not imposed automatically. Instead, the petitioner was sentenced by a jury to life without parole only after a sentencing hearing at which he was permitted to present mitigation evidence, . . . including . . . evidence that emphasized his youth, immaturity, and expert testimony regarding his mental illness.

*Id*. at *7.

After our supreme court released its opinion in *Booker*, Mr. Brown filed a motion to reopen his post-conviction petition, acknowledging that he received an individualized sentencing hearing in which his youth was considered as a mitigating factor but claiming that the hearing was tainted by the fact that Tennessee's sentencing scheme did not allow the trial court to sentence him to anything less than life in prison. *Brown v. State*, No. W2024-00712-CCA-R28-PC, at *1 (Tenn. Crim. App. June 6, 2024) (order), *perm. app. denied Brown v. State*, W2024-00712-CCA-R11-PC (Tenn. Oct. 25, 2024). The post-conviction court denied the petitioner's motion to reopen, and this court affirmed the post-conviction court, concluding that *Booker* did not apply. *Id*. at *3. As this court reiterated, "The [p]etitioner had a sentencing hearing where he was able to present to the jury 'evidence that emphasized his youth, immaturity, and expert testimony regarding his mental illness.'" *Id*. at *4 (quoting *Brown*, 2016 WL 1562981, at *7).

The Petitioner contends that *Brown* is distinguishable because Mr. Brown received a sentencing hearing in which an expert testified about his mental illness; thus, Mr. Brown's sentencing hearing complied with *Booker*. However, the main takeaway from

*Brown* is that *Booker* does not apply to a juvenile offender's sentence of life without parole because that sentence is neither mandatory nor automatic.

Turning to the instant case, we initially note that part of the post-conviction court's rationale for granting the Petitioner's motion to reopen, granting post-conviction relief, and reducing his sentences of life without parole to life was the court's finding that trial counsel was ineffective for failing to demonstrate a particularized need for expert services. However, that issue already had been adjudicated by this court in *Daniel*, 2004 WL 2159004, at *6-7, and was not before the post-conviction court. *See State v. Jefferson*, 31 S.W.3d 558, 560-61 (Tenn. 2000) (discussing law of the case doctrine).

Regarding the post-conviction court's applying *Booker* and reducing the Petitioner's sentences of life without parole to life, the trial court already held an individualized sentencing hearing in which the jury was to determine the Petitioner's sentences for the first degree murders of Mr. Jones and Ms. Thomas. During opening statements, the State contended that two aggravating circumstances were applicable: (6) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the Petitioner and (7) the offense was knowingly committed, solicited, directed, or aided by the Petitioner, while the Petitioner had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder and robbery. Tenn. Code Ann. § 39-13-204(i)(6), (7). Defense counsel asserted that the proof showed that the following mitigating factors were applicable: (1) the Petitioner had no significant history of prior criminal activity; (2) the offense was committed while the Petitioner was under the influence of extreme mental or emotional disturbance; (7) the Petitioner's youth or advanced age at the time of the crimes, noting that "[t]here's no question Mr. Daniel was a juvenile at the time this crime was committed"; and (8) the capacity of the Petitioner to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of intoxication, which was insufficient to establish a defense to the crime but which substantially affected his judgment. *Id*. at § 39-13-204(j)(1), (2), (7), (8).

Four witnesses testified for the Petitioner about his youth. For the most part, their testimony was very complimentary, describing him as a happy child, respectful, and intelligent. However, they also testified that the Petitioner changed as he became a teenager. His grades declined; he stopped attending church regularly; and he began having drug, alcohol, and behavior problems, which his mother attributed to his adult friends. At the conclusion of the testimony, the State asked that the jury find the two aggravating circumstances applicable and sentence the Petitioner to life without parole while defense counsel requested that the jury find the four mitigating circumstances applicable and sentence the Petitioner to life. The trial court instructed the jury on the aggravating and

mitigating circumstances, and the jury chose to sentence the Petitioner to the greater offense of life without parole for the first degree felony murders of Ms. Thomas. Under these circumstances, *Booker* did not confer a new constitutional right upon the Petitioner. Accordingly, we reverse the post-conviction court's order granting the Petitioner's motion to reopen the post-conviction petition, granting post-conviction relief, and reducing the sentences of life without parole to life.

## CONCLUSION

Based upon the oral arguments, the record, and the parties' briefs, the judgment of the post-conviction court is reversed. The Petitioner's original sentences of life without parole for the first degree felony murders of Ms. Thomas in counts three and four are reinstated.

s/ John W. Campbell
JOHN W. CAMPBELL, SR., JUDGE